IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| WAYNE WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, KENNETH | ) | |
| BOUDREAU, JOHN HALLORAN, | ) | |
| BERNARD RYAN, ROBERT | ) | |
| LENIHAN, JOHN POLUSZNY, | ) | |
| MICHAEL CLANCY, JOHN BALL, | ) | JURY TRIAL DEMANDED |
| JAMES O'BRIEN, GERALD CARROLL, | ) | |
| ELIZABETH SHINN, JOHN STOUT, | ) | |
| AND UNKNOWN EMPLOYEES OF | ) | |
| THE CITY OF CHICAGO, | | |
| | | |
| Defendants. | | |

## COMPLAINT

NOW COMES Plaintiff, WAYNE WASHINGTON, by and through his attorneys,

STEVEN A. GREENBERG and STEVEN FINE, and complaining of KENNETH BOUDREAU,

JOHN HALLORAN, BERNARD RYAN, ROBERT LENIHAN, JOHN POLUSZNY, MICHAEL

CLANCY, JOHN BALL, JAMES O'BRIEN, GERALD CARROLL, ELIZABETH SHINN, and

UNIDENTIFIED EMPLOYEES OF THE CITY OF CHICAGO (collectively "Defendant

Officers") and THE CITY OF CHICAGO (hereinafter "City"), alleges as follows:

### Introduction

1.     Plaintiff, WAYNE WASHINGTON, was convicted of the murder of Marshall

Morgan, Jr., a murder that he did not commit. Arrested in the prime of his life, Plaintiff

was sentenced to 25 years in prison, spending years after with the stigma of being a convicted murder, before he was ultimately exonerated in 2015.

2.      Plaintiff was convicted after the Defendant Officers engaged in a tapestry of egregious wrongdoing, including fabricating evidence, fabricating a statement, threatening witnesses and withholding exculpatory evidence in an effort to shortcut the investigatory process and frame Plaintiff for a crime he had nothing to do with.

3.      Meanwhile, the Defendants ignored compelling evidence that another individual – the victim's estranged father, Marshall Morgan, Sr. – actually committed the crime. Unlike Plaintiff, Morgan, Sr. had a motive and a *modus operandi* of committing similar murders. Morgan, Sr. had recently taken out a life insurance policy on his son, the victim in this case, and had a history of killing for financial gain. As far back as 1977, Morgan, Sr. was convicted of killing a close friend over a debt. In 1995, after his son's murder, Morgan, Sr. was suspected in the murder of his fiancé, Michelle Soto, and he was ultimately convicted of the 2001 murder of his girlfriend, Deborah Jackson.

4.      Never giving up on proving his innocence, Plaintiff worked tirelessly inside and outside the courts to show that he had absolutely nothing to do with this crime. On February 9, 2015, the State, after reinvestigating, agreed to vacate his conviction, and dismissed all charges against Plaintiff. This lawsuit seeks redress for his injuries.

**Jurisdiction**

5.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

6. This Court has jurisdiction for Plaintiff's constitutional claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction his state law claims pursuant to 28 U.S.C. §1367. Venue is proper under 28 U.S.C. § 1391(v). The events giving rise to this complaint occurred in this judicial district.

## The Parties

7. Wayne Washington is now 42 years old. He is the father of ten children (an eleventh passed away in 2009). Since his release from prison he has worked at McDonald's, for family, and at an RV factory.

8. At all times relevant hereto, Defendants Kenneth Boudreau, John Halloran, Bernard Ryan, Robert Lenihan, John Poluszny, Michael Clancy, John Ball, James O'Brien, Gerald Carroll, John Stout, Elizabeth Shinn and other unidentified employees of the Chicago Police Department ("Defendant Officers") were police officers or otherwise employed by the Chicago Police Department. All are sued in their individual capacities, and acted under color of law and within the scope of their employment during the investigation of the murder at issue.

9. Defendant City of Chicago is an Illinois municipal corporation. The City of Chicago is or was the employer of each of the Defendant Officers.

## The Crime

10. On or about May 8, 1993, 20 year-old Marshall Morgan, Jr. disappeared. Morgan, Jr. was a college student at Illinois Institute of Technology and a standout basketball player.

11.     On or about May 15, 1993, Morgan, Jr.'s body was found inside his abandoned car. He was nude except for a black-and-white t-shirt, and his body was wedged between the front and back seats of the car.

12.     There was a large amount of litter found inside the car, including but not limited to beer cans and bottles, and a prisoner property envelope with the name "Laron Hyde" on it. Morgan, Jr.'s checkbook was also found inside the vehicle, along with $17 in cash.

13.     The medical examiner determined that Morgan, Jr. died of three gunshot wounds from a .38 caliber gun.

**Marshall Morgan, Sr.**

14.     One of the last people to see Morgan, Jr. on the day he disappeared was his estranged father, Marshall Morgan, Sr. The victim, Morgan, Jr., had allegedly gone to see his father, Morgan, Sr., at Corliss High School, where Sr. worked as a janitor.

15.     Morgan, Sr. had only recently reconnected with his son, after an absence of seventeen years.

16.     At the same time, Morgan, Sr. was facing a mounting financial crisis. He declared in court filings that he was destitute, his house was in foreclosure and he was being sued for child support.

17.     Shortly after he re-appeared, Morgan, Sr. took out a life insurance policy on his healthy twenty-year old son.

18.     Just five months after Morgan, Sr. took out a life insurance policy on him, Morgan, Jr. was found dead. Morgan, Sr. collected nearly $50,000 on the policy.

19.     In 1977, Morgan Sr. had shot and killed his close friend over a $700 debt. Morgan, Sr. was convicted of voluntary manslaughter.

20.     In 1995, while Plaintiff was awaiting trial, Morgan, Sr.'s then-fiancé, Michelle Soto was shot and killed, her nude body wedged between the front and back seats of her abandoned car.

21.     Just months before her death, Morgan, Sr. took out a life insurance policy on her.

22.     After Soto's death, Morgan, Sr. collected over $100,000 from that policy. He also fraudulently transferred the deed to her house into his name.

23.     In 2001, Morgan, Sr.'s then-girlfriend, Deborah Jackson, was shot and killed, her partially nude body left inside the trunk of her abandoned car.

24.     Just prior to Ms. Jackson's death, she and Morgan, Sr. had been arguing over $25,000 that he claimed she had taken from him.

25.     Morgan, Sr. confessed to killing Ms. Jackson; he was convicted and sentenced to 75 years in prison for her murder.

26.     Plaintiff never met Morgan, Jr. and had absolutely nothing to do with his death.

### The Police Investigation

27.     Morgan, Jr.'s murder was a "heater" case in Chicago. There was significant media attention and pressure to solve the case.

28.     The Defendant Officers short-circuited the criminal investigation, coercing witnesses and fabricating evidence in an effort to unlawfully target Plaintiff and his co-defendant, Tyrone Hood.

29.     There was a large assortment of trash within the vehicle. Morgan Jr.'s mother told the police that he had cleaned the vehicle that day. At that time Morgan Sr. was working as a janitor and his duties included emptying the trashcans outside of the school.

30.     Included with the trash were five beer cans, six liquor bottles, and a prisoner property envelope bearing the name "Laron Hyde". Hyde was brought to area one for questioning. He told police that he had thrown the envelope away more than a month before and that he frequented the area around the high school where Morgan, Sr, worked, which was in the neighborhood that Hyde lived in. Hyde was eventually released.

31.     According to the Defendant Officers, they began searching for Hood. Their stated reason for suspecting Plaintiff was that they already allegedly found his fingerprints on two beer bottles that were among the trash strewn inside Morgan, Jr.'s car.

32.     For two days – from May 20, 1993 through May 22, 1993 – Hood was in police custody. During this time, he was repeatedly interrogated, coerced and beaten by the Defendant Officers.

33.     During those interrogations, the Defendant Officers fabricated statements and attributed them to Hood, including that he had touched various alcohol bottles, that

6

he had been in the neighborhood where Morgan, Jr.'s car was found, and that he gave allegedly inconsistent alibis for the time period surrounding Morgan, Jr.'s disappearance. None of those statements were true.

34.     When asked in other proceedings whether they had threatened Hood, pointed a gun at him, or physically abused him, Detectives Halloran and O'Brien invoked their Fifth Amendment rights.

35.     After two days in police custody, Plaintiff was released. The Defendant Officers had no probable cause to hold him any longer or to charge him with a crime.

36.     Still, all of the evidence that the Defendant Officers fabricated while Hood was in custody was introduced and used against him at his criminal trial.

37.     The fingerprints of Joe West had been discovered on a beer can in the car. He was located and brought to Area One. The officers threatened him until he eventually provided a statement implicating Hood. When he was released he admitted his statements were a lie.

38.     The manner in which West was coerced into implicating Plaintiff in the crime was never disclosed to the prosecutor or to Plaintiff or his criminal defense attorney.

39.     Five days later, the Defendant Officers again arrested Hood and subjected him to another round of interrogations.

40.     The Defendant Officers also seized Plaintiff.  Both he and Hood were arrested at a corner store and taken to the Area One Detective Division ("Area One").

41.     Once there, Plaintiff denied having anything to do with the murder.

7

42.     Undeterred, the Defendant Officers focused on coercing witnesses and fabricating additional evidence to pin the murder on Plaintiff.

43.     The Defendant Officers used physical violence against Plaintiff, including punching and slapping him while he was handcuffed, and told him that West had implicated him, until he agreed to sign a confession that was absolutely false.

44.     In the false confession, the Defendant Officers fabricated that Hood had brought Plaintiff a black hooded sweatshirt after he and Plaintiff had shot and killed Morgan, Jr.

45.     The Defendant Officers claim they then went to Washington's house and allegedly recovered a black sweatshirt, which they claimed was Morgan, Jr.'s.

46.     Finally, the Defendant Officers coerced Jody and Michael Rogers into falsely implicating Hood and Washington in the crime.

47.     Jody and Michael Rogers were brothers who lived in the neighborhood; neither knew anything about the murder of Morgan, Jr. The Defendant Officers interrogated Jody over the course of two days. During that time, the Defendant Officers threatened to charge him with murder, threatened him with physical harm and physically beat him. Tired, scared and wanting to go home, Jody provided a statement inculpating Hood and Washington that was fabricated and false.

48.     Michael Rogers also knew nothing about the murder of Marshall Morgan, Jr. and said so to the Defendant Officers. Nonetheless, the Defendant Officers falsely reported that Michael provided them with the same account of Hood and Washington's culpability as his brother, Jody.

8

49.     The Defendant Officers induced Michael to testify consistent with his brother by providing him with ~~approximately~~ financial and other benefits. None of those benefits were ever disclosed to the prosecutor or to Plaintiff or his criminal defense attorney.

### The Police Investigation Falls Apart

50.     Built on lies, the Defendant Officers' investigation began to crumble before Plaintiff's trial commenced.

51.     Every single witness the ~~state~~ police had coerced into false statements and confessions recanted their statements.

52.     Joe West disavowed his statement to the police and his testimony before the grand jury, explaining that he was coerced by the Defendant Officers into falsely implicating Plaintiff.

53.     Jody Rogers similarly recanted his statement to the police and his testimony before the grand jury, explaining that both were a by-product of the Defendant Officers' coercion.

54.     Jody's brother, Michael, did the same, admitting that he knew nothing about Morgan, Jr.'s murder or Plaintiff's involvement in it.

### The Defendant Officers Unlawfully Induce
### A Witness to Identify Plaintiff

55.     Before Hood's bench trial, Defendant Officers went out and found their eleventh hour witness: Emanuel Bob. Bob testified that three years prior, on the night

before Mother's Day, he saw Plaintiff drive up to Bob's girlfriend's home in the victim's

car, from a second story window with a view obstructed by a tree. He stated that

Washington then approached Plaintiff and the car.

56.     Bob's testimony was false and fabricated; he never reported this alleged

sighting in the three years that passed between the crime and Plaintiff's trial because it

never happened. Instead, the Defendant Officers unlawfully induced Bob into

identifying the victim's car, Hood and Washington by spoon feeding information to him

and subjecting him to an unduly suggestive photo array that contained only a

photograph of Hood, a photograph of Washington and two photographs of the victim's

car.

57.     Indeed, Bob has admitted that he did not know Hood or Washington, and

that he never saw either inside the victim's car.  Despite being obviously exculpatory,

the Defendant Officers never disclosed that information to the prosecution or defense.

58.     Moreover, after showing Bob the photo array, the Defendant Officers lost

or destroyed it along with any related police reports memorializing the array. The

Defendant Officers have offered no explanation for having lost or destroyed such

material evidence.

59.     Destroying the array, however, enabled the Defendant Officers to claim

that the array was not unduly suggestive when it was. For example, the Defendant

Officers fabricated reports and falsely alleged that they had shown Bob photographs of

multiple black males when in fact they had only shown him pictures of Washington and

Hood.

60.     In addition, on the eve of trial the prosecutor offered Jody a deal on his then-pending charges in exchange for testifying against Wasington and Hood. Jody took the deal and testified against them.  His brother, Michael, also renounced his recantation and testified consistent with his brother.

## Plaintiff's Wrongful Conviction

61.     On May 7, 1996, based on the Defendants' fabricated evidence and the unlawfully induced and coerced testimony of witnesses, Hood was wrongfully convicted of murder.  He was sentenced to a total of 75 years in the Illinois Department of Corrections.

62.     After Hood was convicted, P plaintiff's case was tried before a jury. The jury could not reach a verdict and a mistrial was declared.

63.     The prosecution then offered Washington a plea deal-in exchange for a guilty plea they would agree to a sentence of 25 years.  He pled.

64.     During Plaintiff's criminal proceedings, the Defendant Officers committed perjury by, for example, denying they committed any misconduct and testifying to statements that Plaintiff never made.

65.     Without the Defendants' misconduct, Plaintiff never would have been arrested, let alone convicted.

## Plaintiff's Exoneration

66.     Never giving up on proving his innocence, in 2015, Plaintiff was finally exonerated.  On February 9, 2015, the State agreed to vacate Washington's conviction and dismissed all charges against him in a manner indicative of his innocence.

**Chicago's Practice of Coercing False Statements**

67.     The constitutional violations that caused Plaintiff's wrongful conviction were not isolated events.  To the contrary, they were the result of the City of Chicago's policies and practices of pursuing wrongful convictions through reliance on coerced statements and profoundly flawed investigations.

68.     The Defendant Officers' coercion of false statement(s) from Plaintiff, Hood, and witnesses in this case was undertaken pursuant to, and proximately caused by, a policy and practice on the part of the Department.

69.     In an article examining thousands of murder cases in Chicago from 1991 through 2000, *The Chicago Tribune* found that Chicago police detectives had been involved in a wide range of cases that ultimately collapsed even though the detectives had obtained confessions.

70.     That article examined inculpatory statements taken by Defendant Boudreau. According to the Tribune's survey, "Boudreau stands out not only for the number of his cases [with confessions] that have fallen apart, but for the reasons." For example, in those cases, Boudreau has been accused by defendants of punching, slapping or kicking them, just as he did with Washington and the witnesses here.

71.     To date, Defendant Boudreau has obtained murder confessions from more than a dozen people for whom the charges were either dropped or the defendant was acquitted notwithstanding the supposed confessions. Likewise, he has obtained coerced inculpatory statements from witnesses to corroborate those false confessions.

12

72.     For a two-year period in the early 1990s, for example, Defendant Boudreau and his partner, Defendant Halloran helped "solve" at least five murders with "confessions" that ended with acquittals. All of these suspects alleged that Boudreau and/or Halloran mistreated them to obtain false confessions.

73.     Defendants Boudreau's and Halloran's misconduct in soliciting false "confessions" and witness statements are just two of the more prominent examples of the wide-spread policy and practice within the Department.

74.     The wrongful convictions of innocent persons involving coerced and false statements include numerous cases in which Department detectives used the very same tactics that the Defendants employed against Plaintiff, his co-defendant and the witnesses in this case.  These tactics include: (a) physical abuse; (b) psychological intimidation and manipulation; (c) fabrication of confessions; (e) concealment of exculpatory information; (f) false promises of leniency in exchange for "cooperation" in the form of a statement; and (g) use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons without regard to their actual guilt.

75.     Consistent with the municipal policy and practice described in the preceding paragraph, members of the Department, including but not limited to the Defendant Officers, systematically suppressed evidence pertaining to these fabricated and coerced statements, both from the Cook County State's Attorney's Office and from criminal defendants and their counsel.

76.     As a matter of both policy and practice, municipal policy makers and Department supervisors condoned and facilitated a code of silence within the Chicago

Police Department. In accordance with this code, Department detectives refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

77. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct; failing to investigate cases in which the police are implicated in obtaining coerced and false statements, as well as wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the Department, Chicago police officers (including the Defendant Officers here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

78. The City's failure to train, supervise, and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

79. The City of Chicago and officials within the Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

80.     City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein consciously approved the policies and practices described in the foregoing paragraphs.

**Plaintiff's Damages**

81.     Plaintiff spent years in prison for crimes that he did not commit.  Plaintiff must now attempt to make a life for himself outside of prison without the benefit of years of life experiences, which normally equip adults for that task.

82.     Additionally, the emotional pain and suffering caused by losing years during the prime of his life has been substantial.  During his wrongful incarceration, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  He missed out on the ability to raise his children, share holidays, births, funerals and other life events with loved ones, and on the fundamental freedom to live one's life as an autonomous human being.

83.     As a result of the foregoing, Plaintiff has suffered tremendous damage, including physical sickness and injury, and emotional damages all caused by the Defendants' misconduct.

**COUNT I – 42 U.S.C. § 1983**
**Violation of Due Process**

84.     Each paragraph of this Complaint is incorporated as if restated fully herein.

85.     As described more fully above, all of the Defendant Officers, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

86.     In the manner described more fully above, the Defendant Officers, individually, jointly, and/or in concert and in conspiracy, fabricated false reports and other evidence, deliberately withheld exculpatory evidence, destroyed and/or intentionally lost material evidence, and used an unduly suggestive identification procedure.  In doing so, the Defendants violated their clearly established duties to report all material exculpatory and impeachment information to prosecutors, and to preserve material evidence.

87.     The destruction or loss of evidence was done in bad faith, and/or was done so that Plaintiff could not present obviously exculpatory evidence at trial.

88.     Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been pursued, and Plaintiff would not have been convicted.

89.     The Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiff and his continuing wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the United States Constitution.

90.     As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, physical sickness, and emotional distress.

91.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## COUNT II – 42 U.S.C. § 1983
## Failure to Intervene

92.     Each paragraph of this Complaint is incorporated as if restated fully herein.

93.     In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

94.     As a direct and proximate result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

95.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## Count III – 42 U.S.C. § 1983
## Federal Malicious Prosecution[1]

96.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

---

[1]     Plaintiff is including this claim in his Complaint to preserve it in the event that the Supreme Court decides that there is a federal malicious prosecution claim, *see Manuel v. City of Joliet et. al.*, No. 14-9496, 2016 WL 205942 (U.S. Jan. 15, 2016), or the Seventh Circuit overturns its ruling in *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001).

97.     Defendant Officers caused Plaintiff to be unreasonably seized and further caused Plaintiff to be improperly subjected to judicial proceedings for which there was no legitimate probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of his innocence.

98.     The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

99.     Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured.  In so doing, the Defendant Officers fabricated evidence, withheld exculpatory information, destroyed and/or lost material, exculpatory evidence and used unduly suggestive identification procedures to induce a false identification of Plaintiff.

100.    The misconduct in this Count violated Plaintiff's rights under the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

101.    The misconduct described in this Court was undertaken with malice, willfulness, and reckless indifference.

102.    The misconduct described in this Count was undertaken pursuant to the City's policy and practice in the manner more fully described above.

103.    As a result of this misconduct, Plaintiff sustained, and continues to sustain, injuries including physical injury and sickness, and emotional pain and suffering.

### COUNT IV – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

104.    Each paragraph of this Complaint is incorporated as if restated fully herein.

105.    After the murder of Marshall Morgan, Jr., the Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

106.    Additionally, before and after Plaintiff's conviction, the Defendant Officers further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more timely exoneration.

107.    In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

108.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above – such as fabricating evidence, withholding exculpatory evidence, coercing false statements, using unduly suggestive identification procedures, and committing perjury during hearings and trials – and was an otherwise willful participant in joint activity.

109.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical sickness, and emotional distress.

110.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights.

## COUNT V – 42 U.S.C. § 1983
## Fifth and Fourteenth Amendments

111.    Each paragraph of this Complaint is incorporated as if restated fully herein.

112.    In the manner described more fully above, the Defendant Officers, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

113.    As described more fully above, the Defendant Officers conducted an unconstitutional interrogation of Plaintiff, which caused Plaintiff to make involuntary statements implicating himself in the murder.

114.    The false statements written and coerced by the Defendant Officers and attributed to Plaintiff were used against Plaintiff to his detriment in a criminal case. These statements were the primary reason that Plaintiff was prosecuted.

115.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

116.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to physical injury and sickness, loss of liberty, and emotional distress.

## COUNT VI – 42 U.S.C. § 1983
## Municipal Liability

117.    Each paragraph of this Complaint is incorporated as if restated fully herein.

118.    The actions of all the individual Defendant Officers were undertaken pursuant to policies and practices of the Department, described above, which were ratified by policymakers for the City of Chicago with final policymaking authority.  These policies and practices included but were not limited to the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above.

119.    The policies and practices described in this Count were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

120.    As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

121.    The City of Chicago is therefore liable for the misconduct committed by the Defendant Officers.

## COUNT VII – State Law Claim
## Malicious Prosecution

122.    Each paragraph of this Complaint is incorporated as if restated fully herein.

123.    The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

124.    The Defendant Officers caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury.

125.    Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. The Defendant Officers also fabricated evidence, coerced false inculpatory statements from Plaintiff's co-defendant and witnesses, withheld exculpatory evidence that would have demonstrated Plaintiff's absolute innocence, destroyed material, exculpatory evidence and used unduly suggestive identification procedures.  The Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the Morgan, Jr. murder.

126.    The Defendant Officers intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence which would have led to the actual

perpetrator. The Defendant Officers withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

127. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

128. On February 9, 2015, the prosecution terminated in Plaintiff's favor when his conviction was vacated.

129. As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including physical sickness and emotional distress.

## COUNT VIII – State Law Claim
## Intentional Infliction of Emotional Distress

130. Each paragraph of this Complaint is incorporated as if restated fully herein.

131. The acts and conduct of the Defendant Officers as set forth above were extreme and outrageous. The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

132. As a direct and proximate result of the Defendant Officers' actions, Plaintiff suffered and continues to suffer physical sickness and severe emotional distress.

## COUNT IX – State Law Claim
## Civil Conspiracy

133. Each paragraph of this Complaint is incorporated as if restated fully herein.

134.    As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

135.    In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

136.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

137.    As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages, including physical sickness and severe emotional distress, as is more fully alleged above.

## COUNT X – State Law Claim
## Respondeat Superior

138.    Each paragraph of this Complaint is incorporated as if restated fully herein.

139.    In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the Department, acting at all relevant times within the scope of their employment and under color of law.

140.    Defendant City of Chicago is liable as principals for all torts committed by its agents.

## COUNT XI – State Law Claim

**Indemnification**

141.    Each paragraph of this Complaint is incorporated as if restated fully herein.

142.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

143.    The Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, WAYNE WASHINGTON, respectfully requests that this Court enter judgment in his favor and against Defendants, KENNETH BOUDREAU, JOHN HALLORAN, BERNARD RYAN, ROBERT LENIHAN, JOHN POLUSZNY, MICHAEL CLANCY, JOHN BALL, JAMES O'BRIEN, GERALD CARROLL, JOHN STOUT, ELIZABETH SHINN, and UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, AND THE CITY OF CHICAGO, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

**JURY DEMAND**

Plaintiff, WAYNE WASHINGTON, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,
WAYNE WASHINGTON

/s/  Steve Greenberg

Steven A. Greenberg
Steven A. Greenberg and Assoc., Ltd.
53 W. Jackson Blvd.
Suite 1260
Chicago, IL 60604
(312) 879-9500

Steven H. Fine
53 W. Jackson Blvd.
Suite 1260
Chicago, IL 60604
(312) 922-0855