## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| WAYNE WASHINGTON, | |
| Plaintiff, | |
| v. | No. 16-cv-01893<br>Judge John F. Kness |
| KENNETH BOUDREAU, JOHN HALLORAN, BERNARD RYAN, ROBERT LENIHAN, JOHN POLUSZNY, MICHAEL CLANCY, JOHN BALL, JAMES O'BRIEN, GERALD CARROLL, ELIZABETH SHINN, JOHN STOUT, UNKNOWN CHICAGO POLICE OFFICER(S), and CITY OF CHICAGO, | |
| Defendants. | |

| | |
|---|---|
| TYRONE HOOD, | |
| Plaintiff, | |
| v. | No. 16-cv-01970<br>Judge John F. Kness |
| CITY OF CHICAGO, KENNETH BOUDREAU, JOHN HALLORAN, BERNARD RYAN, ROBERT LENIHAN, JOHN POLUSZNY, MICHAEL CLANCY, JOHN BALL, JAMES O'BRIEN, GERALD CARROLL, ELIZABETH SHINN, JOHN STOUT, UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, | |
| Defendants. | |

## MEMORANDUM OPINION & ORDER

This case arises out of the 1993 murder of Marshall Morgan Jr. and the ensuing prosecution of two individuals, Plaintiffs Tyrone Hood and Wayne Washington, for that murder. Hood and Washington spent 22 years and 12 years, respectively, incarcerated for Morgan Jr.'s murder. Each of the Chicago Police Department (CPD) Officer Defendants, Kenneth Boudreau, John Halloran, Bernard Ryan, Robert Lenihan, James O'Brien, and Gerald Carroll,[1] played a role in the investigation that precipitated Plaintiffs' incarceration. After Plaintiffs were released from prison and their convictions were vacated, they brought the present suits[2] arguing that the investigation as well as the municipal policies that led to Plaintiffs' wrongful incarcerations were unconstitutionally flawed.

Presently before the Court are Defendants' motions to bar all or parts of the opinions and testimony of several of Plaintiffs' proposed experts (Dkt. 485, Dkt. 495, Dkt. 496, Dkt. 533; No. 16-cv-01893, Dkt. 295, Dkt. 306, Dkt. 307, Dkt. 327) as well as Defendants' motions for summary judgment (Dkt. 482, Dkt. 493; No. 16-cv-01893, Dkt. 292, Dkt. 304). For the reasons given in the accompanying Opinion:

---

[1] As discussed below, because Plaintiffs are no longer proceeding against John Stout, John Ball, Elizabeth Shinn, Michael Clancy, and John Poluszny (*see* Dkt. 531 at 75), the Court will not consider the claims against any of those officers in the remainder of this Opinion.

[2] Plaintiff Washington filed suit on February 2, 2016. (*See Washington v. Boudreau*, No. 16-cv-01893, Dkt. 1.) Plaintiff Hood filed suit on February 5, 2016. (*See Hood v. City of Chicago*, No. 16-cv-01970, Dkt. 1.) Although not consolidated, the cases were deemed related on August 30, 2017. (*See Washington*, No. 16-cv-01893, Dkt. 98.) Unless otherwise noted, all docket citations in this opinion are to *Hood v. City of Chicago*, No. 16-cv-01970.

- Defendant City of Chicago's motion to bar Timothy Longo from testifying about the City's early intervention system and the City's supervision of police officers (Dkt. 485; No. 16-cv-01893, Dkt. 295) is denied.

- Defendant City of Chicago's motion to bar William Bridges and to bar Longo's opinions that are based on Bridges's analyses (Dkt. 533; No. 16-cv-01893, Dkt. 327) is denied.

- The Officer Defendants' motion to bar Melissa Russano from testifying about subjects beyond her expertise (Dkt. 496; No. 16-cv-01893, Dkt. 307) is granted in part and denied in part. Russano is barred from testifying about the application of her reliability analysis to statements in the present case. The Officer Defendants' motion is denied in all other respects.

- The Officer Defendants' motion to bar Jonathan Arden from testifying as a rebuttal witness (Dkt. 495; No. 16-cv-01893, Dkt. 306) is denied.

- Defendant City of Chicago's motion for summary judgment (Dkt. 482; No. 16-cv-01893, Dkt. 292) is denied.

- The Officer Defendants' motion for summary judgment (Dkt. 493; No. 16-cv-01893, Dkt. 304) is granted in part and denied in part. Because they are entitled to qualified immunity, summary judgment is granted in favor of Defendants Ryan and Lenihan as to Plaintiffs' claim that those officers violated Plaintiffs' due process rights by showing Plaintiffs' photographs to two witnesses. Summary judgment is denied in all other respects.

## I.     BACKGROUND

This case begins with—and is pervaded by—the senseless murder of Marshall Morgan Jr., a 21-year-old honor student and basketball team co-captain who attended the Illinois Institute of Technology. Morgan Jr. was reported missing on May 9, 1993. (Dkt. 558 ¶ 8.) On May 17, Morgan Jr.'s body was found wedged between the front and back seats of his mother's car after a citizen reported an odor emanating from the parked car. (*Id.* ¶¶ 9−10.) Morgan Jr. had been shot three times. (*Id.* ¶ 13.) Defendants Ryan, Lenihan, and Posluszny—all homicide detectives—began investigating Morgan Jr.'s murder by taking notes at the scene and inventorying the car in which Morgan Jr. was found. (*Id.* ¶¶ 14−15.) They found bottles and cans of beer as well as other "miscellaneous items." (*Id.* ¶¶ 11, 48.) There were no eyewitnesses to Morgan Jr.'s murder, and a canvass of the area where the car was found did not yield any information about the potential identity of the perpetrator(s). (*Id.* ¶ 43.)

On May 18, 1993, Mitra Kalelkar, a medical examiner, performed an autopsy on Morgan Jr.'s body, concluding that the body was in an "advanced state of decomposition." (*Id.* ¶ 17.) Kalelkar concluded that Morgan Jr. "was first shot in the abdomen" and that he "could have lived for one to three days with this single gunshot wound." (*Id.* ¶ 19.) (One of Plaintiffs' experts disputes some of the conclusions Kalelkar drew, including Kalelkar's conclusion about how long Morgan Jr. likely lived after he was shot. *Id.* ¶ 22.)

4

On May 20, CPD latent fingerprint examiners reported finding Plaintiff Hood's fingerprints on a beer bottle and beer can recovered from the car. (*Id.* ¶ 49.) Defendants Ryan, Lenihan, and Posluszny stopped Hood on the street near Hood's home, and Hood agreed to accompany Defendants to the police station for questioning. (*Id.* ¶ 50.) Hood also consented to a search of his home. (*Id.* ¶ 53.)

Plaintiff Hood was at the police station, Area One, for the next two days. Whether that was a volitional act on Hood's part, however, is disputed: Plaintiffs contend that he was "held" at the station, while Defendants characterize Hood as being "voluntarily" present there. (*Id.* ¶ 51.) During that time, Defendants Boudreau, Halloran, and Ball repeatedly questioned Hood about Morgan Jr.'s murder. (*Id.* ¶ 52.) According to Plaintiffs, during his questioning, Hood was "kicked, slapped, choked, and pushed"; Defendant Lenihan "pointed a gun at him"; Defendant Boudreau "beat [Hood] and stepped on [his] face"; and Defendant Ryan "hit Hood and dumped cigar ashes on him[,] and threatened to lock up Hood's wife" and to prevent him from seeing his children. (*Id.* ¶ 56.) The Officer Defendants deny that they physically or mentally abused Hood during his questioning. (*Id.*)

Hood denied any knowledge of Morgan Jr.'s murder. (*Id.* ¶ 54.) According to Plaintiffs, however, Defendants Halloran and Boudreau nonetheless "fabricated" a false statement that they attributed to Hood: Defendants stated that Hood said, "If I don't say anything to explain [I] will go to jail for long time—if I do tell what happened I will go to jail." (*Id.* ¶ 55.) (Although conceding that Hood's statement was recorded in Halloran's notes, Defendants deny that it was fabricated. *Id.*) Hood also submitted

to a polygraph test on the morning of May 21, 1993, and the examiner found that "deception [was] indicated" in Hood's responses—in other words, Hood was lying. (*Id.* ¶ 59.) All the same, because Defendants did not have probable cause to arrest at the time, Hood was released on May 22. (*Id.* ¶¶ 51, 61.)

On May 25, Defendants learned that another fingerprint found in the car had been identified as belonging to Joe West. (*Id.* ¶ 65.) Two days later, while looking for West, Defendants Ryan and Lenihan encountered Plaintiffs Hood and Washington. (*Id.* ¶ 67.) Washington agreed to provide Ryan and Lenihan with information about Hood's whereabouts in the days surrounding Morgan Jr.'s murder (ostensibly, to provide an alibi for Hood), and Hood and Washington agreed to accompany the officers to the police station. (*Id.* ¶ 68.) After locating West, CPD officers took Hood, Washington, and West to Area One. (*Id.* ¶¶ 69−70.)

During the time that West was at the police station (approximately 22 hours, according to Plaintiffs), he initially denied any knowledge of Morgan Jr.'s murder. (*Id.* ¶¶ 72, 75.) But, according to Plaintiffs, Defendants "would not accept" his denials and threatened that they would get the truth out of him. (*Id.* ¶ 73.) Plaintiffs contend that, under pressure from several Officer Defendants, West eventually agreed to tell the officers "what they wanted to hear." (*Id.* ¶ 74.) Plaintiffs also maintain that the Officer Defendants "fed Mr. West non-public facts about the murder to give the appearance that Mr. West's oral statement was truthful when it was not." (*Id.* ¶ 76.) West was taken before a grand jury and testified that Hood was involved in Morgan Jr.'s murder. (*Id.* ¶ 78.)

After obtaining West's confession, Defendant Halloran contacted the Felony Review Unit (FRU) to seek approval for charges against Plaintiff Hood, and Assistant State's Attorney (ASA) Peggy Chiampas was assigned to the case. (*Id.* ¶ 86.) Chiampas met with Halloran and O'Brien at Area One in addition to speaking with both Hood and West. (*Id.* ¶¶ 86−87, 90, 93.) Hood continued to maintain his innocence when he spoke with Chiampas. (*Id.* ¶ 97.) Although Plaintiff Washington was present at the police station, Chiampas did not speak with him. (*Id.* ¶¶ 91, 93.) Plaintiffs contend that the Officer Defendants "hid" Washington from Chiampas because Washington's ability to provide an alibi for Hood—which Defendants were actively trying to disprove—might affect Chiampas's willingness to approve charges against Hood. (*Id.* ¶ 96.) After her visit to Area One, based on the identification of Hood's fingerprints on the beer bottle and beer can in Morgan Jr.'s car as well as West's statement, Chiampas approved charges against Hood. (*Id.* ¶ 99.)

On May 29, 1993, after being at the police station for more than 36 hours, Plaintiff Washington gave a statement implicating Hood and himself in Morgan Jr.'s murder. (*Id.* ¶¶ 100, 102.) According to Plaintiffs, "[t]hat statement was false and fabricated," and Washington "only provided his false statement because the Defendants threatened him, physically abused him and promised Mr. Washington that if he cooperated with them and implicated Mr. Hood in Morgan Jr.'s murder, he could go home." (*Id.* ¶ 100.) Among other things, Plaintiffs contend that Washington "was handcuffed for the entire time he was in custody"; that he was "slapped" during his interrogation; and that "he was not provided any food or water until after he

7

agreed to provide a statement" to the police. (*Id.* ¶¶ 103−05.) Plaintiffs also contend that Defendants Halloran and Boudreau "fed Mr. Washington case specific and non-public facts about the Morgan Jr. homicide" which, according to Plaintiffs, became part of Washington's confession. (*Id.* ¶¶ 106−07.)

Defendant Halloran again contacted FRU, and ASA James Brown went to Area One to take Washington's written statement. (*Id.* ¶ 116.) Before Brown arrived, according to Plaintiffs, Defendants Halloran and Boudreau told Washington that he had to convey certain information to Brown for Washington to be released and to go home. (*Id.* ¶ 117.) On June 17, Defendant Ryan testified before a grand jury about the facts in Washington's and West's statements. (*Id.* ¶ 124.)

Before reaching Plaintiffs' trials, Defendants obtained statements from at least two other individuals: Jody Rogers and Kenneth Crossley. Plaintiffs contend that Defendants fabricated a false statement and procured false grand jury testimony from Rogers, who implicated Hood and Washington in Morgan Jr.'s murder. (*Id.* ¶ 125.) On May 30, police officers brought Rogers to the Area One police station for questioning. (*Id.* ¶ 126.) There, according to Plaintiffs, Defendants Boudreau and Halloran "yelled at [Rogers], hit him in the face and body, twisted his arm behind his back and threatened to charge him with Morgan Jr.'s murder if he did not tell them that Tyrone Hood did [the murder] and that he gave Mr. Hood a gun." (*Id.* ¶ 127.) As with others involved in the case, Plaintiffs contend that the Officer Defendants "gave [Rogers] very specific information that they wanted him to say to implicate Mr. Hood," including that Hood wanted to commit a robbery, that Hood had confessed to the

murder, and that Washington had been with Hood at the time of the murder. (*Id.* ¶¶ 130−33.) Rogers eventually agreed to, and did, provide a statement to ASA Brown inculpating Hood and Washington in Morgan Jr.'s murder. (*Id.* ¶¶ 138−39.) On June 1, 1993, Rogers testified to a grand jury that Hood wanted to commit a robbery and asked Rogers for a gun, as well as that Hood confessed to the murder. (*Id.* ¶¶ 140, 142.)

Plaintiffs also contend that Officer Defendants fabricated an inculpating statement from Rogers's brother, Crossley (also known as "Twinkie"). (*Id.* ¶ 148.) On May 30, while Rogers was in custody, Defendants Boudreau, Halloran, and another detective went to Rogers's home and spoke with Crossley about the Morgan Jr. murder. (*Id.* ¶ 152.) After taking Crossley to the police station, Defendants Boudreau and Halloran told Crossley that he and Rogers were implicated in Morgan Jr.'s murder; according to Plaintiffs, Defendants Boudreau and Halloran threatened to charge Crossley with the murder. (*Id.* ¶¶ 154−55.) As did Rogers, Crossley eventually agreed to testify at Hood's trial that Hood had asked Crossley for a gun and asked whether Crossley wanted to commit a robbery, as well as that Washington was present for the conversation. (*Id.* ¶ 159.)

Plaintiffs contend that West, Rogers, and Crossley each later recanted their inculpatory statements in discussions with Hood's lawyer, James Mullenix. (*See id.* ¶¶ 79−80, 141, 166.) Plaintiffs' false confession expert, Melissa Russano, opines that West, Rogers, Crossley, and Plaintiff Washington each had "individual vulnerabilities that put them at risk" for providing false statements. (*Id.* ¶ 161.)

(Russano's opinions, and the Officer Defendants' motion to bar Russano's testimony, are addressed in greater detail below.)

Questioning the veracity of those recantations, prosecutors including ASAs Rosemary Higgins and Mike Rogers (referred to here as "ASA Rogers" to distinguish him from Jody Rogers) continued to prepare for Plaintiff Hood's trial, which was initially set to begin on March 27, 1996. (*Id.* ¶¶ 166, 169.) But the prosecution team faced several challenges: West died; the prosecutors were concerned about what Rogers and Crossley would say at trial (owing, in part, to their recantations); and Higgins questioned whether Washington's statement would be admissible against Hood. (*Id.* ¶ 169.) To strengthen their case, Higgins or ASA Rogers (it is not clear which) sent Defendants Lenihan and Ryan to find additional corroborating evidence. (*Id.* ¶ 170.)

As instructed, Defendants Ryan and Lenihan went in search of additional evidence against Hood and Washington. According to Plaintiffs, the Officer Defendants proceeded to "fabricate" additional inculpatory statements—from Brenda Cage and Emanuel Bob. (*Id.* ¶¶ 176, 182.) Plaintiffs also contend that Bob (wrongly) admitted to having seen Hood and Washington driving Morgan Jr.'s car around the time of the murder. (*Id.* ¶¶ 182, 193.)

Beyond challenging the veracity of the inculpatory evidence, which Plaintiffs maintain was fabricated, Plaintiffs also present an alternative theory about Morgan Jr.'s murder. According to Plaintiffs, the true killer was Marshall Morgan Sr. (Morgan Jr.'s father), and the Officer Defendants insufficiently investigated Morgan

Sr. In October 1992, a life insurance policy worth $50,000 was taken out on Morgan Jr.—according to Plaintiffs, at Morgan Sr.'s direction. (*Id.* ¶ 198.) Morgan Sr. paid the premiums on the policy. (*Id.*) After Morgan Jr.'s murder, the insurance provider paid the funeral expenses and Morgan Sr. received a payout of $44,593.43. (*Id.* ¶ 202.)

To support their alternative theory, Plaintiffs contend that Morgan Sr. perpetrated another murder—that of his fiancée, Michelle Soto—for insurance proceeds several years after Morgan Jr.'s murder. (Dkt. 558 ¶¶ 203−205.) Approximately five months after Morgan Sr. took out a policy on Soto, her body was found in her car on July 17, 1995, and Morgan Sr. received $128,289.63 under the policy. (*Id.* ¶¶ 205, 212.) Confronted with Morgan Jr.'s and Soto's murders, and the fact that Morgan Sr. benefited from both deaths, the insurance provider dispatched Sharon Jakush to investigate whether there were any connections between the two murders. (*Id.* ¶ 210.) On October 18, 1995, Jakush spoke with Defendant Ryan about a possible link between the murders. (*Id.* ¶ 218.) (The parties dispute the nature and content of that discussion. *Id.*)

No details about the insurance policies on Morgan Jr. or Soto were included in the CPD's records related to Morgan Jr.'s murder. (*Id.* ¶ 211.) According to Plaintiffs, that absence is despite Jakush's conversation with Defendant Ryan as well as a separate discussion between the officer investigating Soto's murder, Detective Przepiora, and Defendant Lenihan about potential links between the two murders. (*Id.* ¶ 217.) Plaintiffs contend that the Officer Defendants "hid" their suspicions about Morgan Sr. from prosecutors in the Officer Defendants' notes (variously called "street

files," "running files," "working files," and more), which were later lost or destroyed. (*Id.* ¶¶ 219, 222, 228.)

On April 25, 1996, Plaintiff Hood's bench trial on charges of murder and armed robbery began in state court before Judge Michael Bolan. (*Id.* ¶¶ 233, 238.) Among others, Rogers, Crossley, Bob, and Defendant Halloran testified against Plaintiff. (*Id.* ¶ 234.) Defendant Halloran's testimony covered, among other things, what Plaintiffs contend was Hood's "fabricated statement." (*Id.*) On May 7, Judge Bolan found Plaintiff Hood guilty. (*Id.* ¶ 238.) During his sentencing, Hood continued to insist on his innocence. (*Id.*) Hood was sentenced to 75 years in prison. (*Id.*)

On August 8, 1996, Washington went to trial. (*Id.* ¶ 239.) That trial resulted in a hung jury. (*Id.* ¶ 240.) Between Washington's first trial and the commencement of his second, Hood was sentenced. (*Id.* ¶ 241.) After seeing the 75-year sentence that Hood received, "Washington was scared and decided to plead to first degree murder" rather than risk a conviction in his second trial. (*Id.*) Washington was sentenced to 25 years. (*Id.*)

After serving 12 years of his sentence, Washington was released from prison. (*Id.*) Even after Washington pleaded guilty, both he and Hood continued to insist on their innocence. (*Id.* ¶ 242.) On January 12, 2015, after 22 years in prison, Governor Quinn commuted Hood's sentence. (*Id.* ¶ 243.) The State vacated both Plaintiffs' convictions on February 9, 2015. (*Id.* ¶ 244.)

On February 2 and February 5, 2016, respectively, Washington and Hood brought separate suits against the City of Chicago and the Officer Defendants.

Plaintiffs allege that Defendant City of Chicago is liable because "the actions of all the individual Defendant Officers were undertaken pursuant to policies and practices" and that those policies and practices "were ratified by policymakers for the City of Chicago with final policymaking authority." (Dkt. 1 ¶ 112; No. 16-cv-01893, Dkt. 1 ¶ 118.)

Against the Officer Defendants, Plaintiffs allege violations of due process, failure to intervene, conspiracy to deprive them of their civil rights, malicious prosecution under state law, intentional infliction of emotional distress, and state-law civil conspiracy. (Dkt. 1 ¶¶ 84−95, 104−10, 116−31; No. 16-cv-01893, Dkt. 1 ¶¶ 84−110, 122−37.) Plaintiff Hood also brings a malicious prosecution claim under federal law (Dkt. 1 ¶¶ 96−103),[3] and Plaintiff Washington separately alleges violations of his Fifth and Fourteenth Amendment rights (No. 16-cv-01893, Dkt. 1 ¶¶ 111−16). The substance of Plaintiffs' claims is described in greater detail below.

Before the Court now are Defendants' motions for summary judgment—filed separately by the City and the Officer Defendants. (Dkt. 482, Dkt. 493; No. 16-cv-01893, Dkt. 292, Dkt. 304.) Defendants also filed motions to bar all or parts of the opinions and testimony of several of Plaintiffs' proposed experts. (Dkt. 485, Dkt. 495, Dkt. 496, Dkt. 533; No. 16-cv-01893, Dkt. 295, Dkt. 306, Dkt. 307, Dkt. 327.)

---

[3] At the outset of this case, Plaintiffs conceded that their federal malicious prosecution claim was only brought to preserve that claim "in the event that the Supreme Court decides that there is a federal malicious prosecution claim . . . or the Seventh Circuit overturns its ruling in *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001)." After their complaints were filed, the Supreme Court recognized such a Fourth Amendment right against "unlawful pretrial detention even beyond the start of the legal process," thus abrogating *Newsome*. *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017). Even in the wake of *Manuel*, Plaintiff Washington is not pursuing a claim for unlawful pretrial detention. (*See* Dkt. 531 at 68 n.16.)

## II.   DEFENDANTS' *DAUBERT* MOTIONS

Resolving Defendants' *Daubert* motions will affect the Court's assessment of their motions for summary judgment. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009) ("To defeat a summary judgment motion, . . . a party may rely only on admissible evidence."). Accordingly, the Court will evaluate Defendants' *Daubert* motions before turning to Defendants' summary judgment motions.

### A.   Standard of Review

A witness who is qualified as an expert by "knowledge, skill, training, or education" may testify if

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As explained by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Court's decision to admit an expert's testimony or opinion is guided by three determinations: (1) "whether the witness is qualified"; (2) "whether the expert's methodology is scientifically reliable"; and (3) "whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers v. Ill. Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted).

In making determinations about admissibility, the Court is required to consider the proposed expert's full range of experience and training in the subject

area, as well as the methodology used to arrive at a particular conclusion. *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000). Although it is imperative that the expert's opinion "be reasoned and founded on data," the reliability of an expert's methodology turns "primarily" on "the validity of the methodology employed by [the] expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013) (citing *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011)).

Under Rule 702, exclusion of expert testimony "is the exception rather than the rule." *See* Fed. R. Evid. 702 Advisory Comm.'s Notes to 2000 Amends. The *Daubert* Court emphasized that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596; *see also Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 765 (7th Cir. 2013); *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). An expert's credibility and "whether his or her theories are correct given the circumstances of a particular case" are "factual" questions that are "left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." *Smith,* 215 F.3d at 719.

In other words, the Court is designated as the "gatekeeper" of expert testimony, but "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at

15

her opinion: the inquiry must focus . . . solely on principles and methodology, not on the conclusions they generate." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (quoting *Daubert*, 509 U.S. at 595); *see also Smith,* 215 F.3d at 719.

## B. Defendant City's *Daubert* Motion to Bar Opinions of Plaintiffs' *Monell* Expert, Timothy Longo

Defendant City of Chicago seeks to bar Plaintiffs' *Monell* expert, Timothy Longo, from opining about the City's early intervention (EI) system and the City's supervision of police officers. (Dkt. 485.) As detailed in his report, Longo was retained to "render an opinion as to the Defendants' conduct during the course of the investigation into the tragic death of Marshall Morgan, Jr." (Dkt. 485-5 at 3.) Longo has been involved in police practices and law enforcement since 1981, including serving as the Chief of Police for Charlottesville, Virginia, and as Police Colonel and Chief of the Technical Services Bureau for the Baltimore Police Department. (*Id.* at 1.) Longo is currently the Associate Vice President for Safety and Security, and the Chief of Police, for the University of Virginia. (*Id.*)

Based on Longo's current and previous experiences, as well as his review of various facts and materials in connection with this case, he would opine that "[t]he Defendants' investigation was wrought with deficiencies that included a rush to judgment and tunnel-vision that improperly narrowed the investigation's focus on Tyrone Hood and Wayne Washington." (*Id.* at 3.) Longo also opines about Defendant City of Chicago's "policy of failing to supervise officers" and its "policy of failing to discipline officers who engage in misconduct." (*Id.* at 68−73.) Among other things, he explains that "effectively deployed" EI systems "can have a dramatic effect on

16

reducing both poor performance and citizen complaints," but that "the City of Chicago and its police department ignored an opportunity to more fully develop and utilize data systems at their disposal that could assist in the monitoring and tracking of high-risk critical tasks." (*Id.* at 69.) In his report, Longo describes what he perceives as deficiencies in Defendant's EI system and in the implementation of that system.

According to Defendant,[4] despite his "lengthy career in policing, Longo's experience with EI systems is negligible" and "his opinions related to supervision are conclusory and without evidentiary basis." (Dkt. 485 at 2.) Defendant contends that Longo's experience with EI systems at Charlottesville and UVA (he did not have any experience with EI systems while employed by the Baltimore Police Department) are insufficient to qualify him to review the much-larger CPD's EI system. Defendant argues specifically that Longo "has no experience with programs having the magnitude and complexity of CPD's." (*Id.* at 8.) Defendant also argues that Longo's lack of relevant knowledge is evidenced by "the methodology he employed in arriving at his opinions": his reliance on deposition testimony of the City's corporate representative "rather than the [EI Program] directive itself, other comparable agencies, or any relevant literature." (*Id.* at 8–9.)

The Court is satisfied that Longo's experience with EI systems qualifies him to opine as an expert in this case. Although Defendant's critiques of Longo's proffered opinions—including the differences in "magnitude and complexity" between CPD's EI

---

[4] Unless otherwise noted, references to "Defendant" in sections of this Opinion pertaining to motions brought by the City of Chicago are to that defendant.

system and those of the police departments where Longo has worked—may undermine the weight and credibility of his testimony, those critiques are more appropriately addressed through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596; *see Stollings*, 725 F.3d at 766 (same). Defendant's critiques are insufficient to bar Longo's testimony.

This same reasoning applies to the data and sources upon which Longo relied in reaching his conclusions. Although the critiques of those data and materials may undermine the weight of Longo's opinion, "the quality of the data used in applying the methodology or the conclusions produced" are not ordinarily a basis for barring an expert from testifying. *Manpower, Inc.*, 732 F.3d at 806 (7th Cir. 2013) (citation omitted).[5]

Defendant also argues that Longo's opinion that the City fails to supervise police officers is unreliable because, according to Defendant, Longo "provides no argument and offers no evidence to support this opinion." (Dkt. 485 at 12–13.) It is true that there must be "a *connection* between the data employed and the opinion offered" and that an "opinion connected to existing data 'only by the *ipse dixit* of the expert,' . . . is properly excluded under Rule 702." *Gopalratnam v. Hewlett-Packard Company*, 877 F.3d 771, 782 (7th Cir. 2017) (emphasis in original). But, contrary to

---

[5] Defendant's argument that Longo's reliance on statistical analysis performed by Plaintiffs' expert statistician, William Bridges, renders Longo's opinion unreliable is addressed separately in the context of Defendant's separate motion to bar Bridges's opinions and testimony (Dkt. 533). (*See below*.)

Defendant's suggestion, Longo's opinion is not connected to data by "*ipse dixit*." Longo draws his conclusions, including those in the section titled "City of Chicago had a Policy of Failing to Supervise Officers," from the "evidence in this matter" (Dkt. 485-5 at 69)—the materials described, for example, in the "Methodology" section (*id.* at 4–5). Longo filters that "evidence" through his knowledge and experience with policing before concluding that there were "enormous barriers" preventing accountability within the CPD. (*Id.* at 55–60.) Longo's evidence and accompanying analysis are enough to support the conclusions he reaches.

Defendant's critiques of Longo's conclusions and the bases of those conclusions may ultimately persuade a jury not to credit Longo's opinion. But those critiques are not grounds to bar Longo from testifying about the City's EI system and its supervision of police officers. Defendant's motion (Dkt. 485; No. 16-cv-01893, Dkt. 295) is denied.

### C. Defendant City of Chicago's *Daubert* Motion to Bar Opinions of Plaintiffs' Statistical Expert, William Bridges, and to bar Longo's opinions that are based on Bridges's analyses

Defendant City of Chicago next seeks to bar William Bridges's proffered opinions as "unreliable and without foundation" and to bar Longo's opinions that are based on Bridges's conclusions. (Dkt. 533 at 1.) Bridges is a Professor Emeritus in the Department of Sociology at the University of Illinois at Chicago. (Dkt. 533-20 at 1.) Bridges's specialties within the field of Sociology "include quantitative and statistical analysis, research methodology, social inequality, and the sociology of labor markets."

19

(*Id.*)[6] Plaintiffs retained Bridges to analyze Complaint Register (CR) Files transmitted to Plaintiffs during discovery. (*Id.*)[7] The 1,230 CR Files included in Bridges's dataset "document allegations made against [police] officers who were assigned to Area One in the Chicago Police Department between the years of 1985 and 1996." (*Id.* at 1−2.) Longo relies on Bridges's analysis of the CR Files in reaching his conclusions (discussed above) about the adequacy of the City's accountability systems, such as that Defendant "failed to discipline officers found to have engaged in misconduct." (Dkt. 533-2 at 73; *see also id.* at 73−83.)

---

[6] Although Defendant expresses concerns that Bridges is not a criminologist, such concerns are better addressed through cross-examination. *See Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016) ("The fact that an expert may not be a specialist in the field that concerns [his] opinion typically goes to the weight to be placed on that opinion, not its admissibility."). Bridges's qualifications in statistical analysis are sufficient for the subject-matter on which Plaintiffs retained him to opine.

[7] *See also, e.g.*, Dkt. 533 ("During *Monell* fact discovery, the City produced to Plaintiffs 1,230 CR files initiated against CPD members assigned to Detective Division Area One from 1985 through 1996. Information from those CRs then was transferred into an Excel spreadsheet by a process known as 'coding.' "); Dkt. 516-7 at 27.

1.  Bridges

Defendant seeks to bar Bridges's opinions for several reasons. First, Defendant argues that Bridges's opinions "are not relevant" because Plaintiffs' *Monell* claims are based "solely on allegations of widespread practices" and "Bridges's statistical results are limited to a narrowly defined subset of the Chicago Police Department (CPD) and are not generalizable to CPD (and hence the City) as a whole." (Dkt. 533 at 2−3.) Second, Defendant argues that the spreadsheet of CR files upon which Bridges relied in his analysis is "fatally flawed." (*Id.* at 2.)

But Bridges's proffered opinions are relevant. An expert's testimony qualifies as relevant under Rule 702 "so long as it assists the jury in determining any fact at issue in the case." *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014). If credited by a jury, Bridges's testimony would support a finding that there is a widespread practice of failing to investigate and discipline police officers who engage in misconduct. *See Connick v. Thompson*, 563 U.S. 51, 60−61 (2011) (plaintiffs seeking to "impose liability on local governments under [Section] 1983 must prove that 'action pursuant to official municipal policy' caused their injury. . . . Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."). Defendant's concerns (discussed in greater detail below) about the generalizability of Bridges's conclusions based on his sample of Area One CR Files go, if anything, to the probative weight of his testimony, not its relevance. Even if a jury discounts the generalizability

of Bridges's conclusions, his conclusions are relevant—a low bar—to understanding Defendant's practices.

The majority of Defendant's concerns are with the data upon which Bridges relied in reaching those conclusions: a spreadsheet compiled by Rachel Kim, a project coordinator employed at the time by Plaintiffs' lawyer.[8] Kim holds a BA with honors from the University of Chicago, and she is currently a PhD student in Sociology at Harvard University. (Dkt. 516-8 at 2.) As Kim explained during her deposition, she supervised a team of people who took information from the CRs and input that information into a spreadsheet. (Dkt. 516-7 at 29.) Kim was also responsible for "quality control of the spreadsheet," which included "making sure . . . the information in the spreadsheet most accurately and consistently represented the information that was contained in the CR files." (*Id.*) To confirm the accuracy of spreadsheet entries, she "select[ed] a random 10 percent of the CRs" and reviewed each of the CRs in that sample to ensure they were properly recorded. (*Id.*)[9]

Contrary to Defendant's assertions, Bridges's reliance on the spreadsheet prepared by Kim is permissible. As the Seventh Circuit acknowledged, "it is common

---

[8] Rachel Kim worked for Plaintiffs' lawyer after college and before starting graduate school.

[9] In their motion, Defendant cites to Rules 803(6) and 1006 of the Federal Rules of Evidence in arguing that the spreadsheet "is inadmissible because it lacks proper foundation and methodological reliability." (Dkt. 533 at 11−12.) But those rules pertain to the admissibility of the spreadsheet at trial, and Defendant's argument is premature in the present *Daubert* motion. In forming their opinions, experts are expressly authorized to consider facts regardless of those facts' admissibility. Fed. R. Evid. 703. To the extent that Plaintiffs seek to admit the spreadsheet at trial, Defendants may renew their objections to the spreadsheet's admissibility at that time.

in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002). The Federal Rules of Evidence confirm that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703; *see also Dura Auto. Sys. of Ind., Inc.*, 285 F.3d at 612–13 ("An expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify."). The spreadsheet created by Kim and her team is such "data" that Bridges "has been made aware of." According to Bridges, such reliance on data compiled by others is "accepted and widespread" in social science research. (Dkt. 516-12 at 1.)

Bridges's reliance on Kim's spreadsheet does not render Bridges a "mouthpiece of a scientist in a different specialty," as Defendant suggests. *Dura Auto. Sys. of Ind., Inc.*, 285 F.3d at 614. In developing the spreadsheet, Kim did not "exercise[] a substantial degree of technical judgment critically relevant to the central contested issues in the case," *Equal Emp. Opportunity Comm'n & Bailey*, 2016 WL 5796890, at *5 (N.D. Ill. Sept. 30, 2016), and her work preparing the spreadsheet does not otherwise render Bridges's reliance on her work impermissible. In fact, Kim and her team are prototypical "data gatherer[s]" upon whose work reliance is straightforwardly permissible. *Dura Auto. Sys. of Ind., Inc.*, 285 F.3d at 613.

Defendant nonetheless challenges (1) Kim's qualifications to supervise the creation of the spreadsheet; (2) the absence of a written coding manual or a

"structured training process" for the coders; and (3) the sufficiency of the quality control process. (Dkt. 533 at 4−11.) Defendant also argues that Bridges's opinions and testimony are unreliable because Bridges "fail[ed] to adhere to the American Statistical Association's (ASA) *Ethical Guidelines for Statistical Practice.*" (Dkt. 533 at 14.) Defendant's ethical attacks include, among others, that Bridges fails to employ "sampling methods and analytical approaches that are appropriate and generalizable"; that Bridges's report "does not come anywhere near meeting the threshold for peer review"; and that Bridges's reliance on data he did not prepare undermines the integrity of his data and methods. (*Id.* at 14−16 (quoting Dkt. 533-3 at 10).)

At bottom, Defendant's concerns about the quality of the data upon which Bridges relied goes to the probative weight of that data, not its admissibility. If Defendant can show that the sample of CR files relied upon by Bridges is not representative of the broader population of CPD CR files, or that the spreadsheet upon which Bridges relied contains inaccurate information about the CR files,[10] a jury may be unwilling to draw from Bridges's testimony conclusions about Defendant's broader practices. But such considerations "go[] to the probative weight of the analysis rather than to its admissibility." *Manpower, Inc.*, 732 F.3d at 808−09 (Whether an expert "selected the best data set to use . . . is a question for the jury, not the judge."); *see also Jordan v. Dominick's Finer Foods*, 115 F. Supp. 3d 950, 963

---

[10] Defendants question the consistency of some of the entries in the spreadsheet. (Dkt. 533 at 7−8.) But Defendants have not pointed to any inaccuracies so egregious as to call into question the reliability of Bridges's reliance on the spreadsheet for his analysis.

(N.D. Ill. 2015) ("[O]bjections as to whether an expert considered certain factors that the opposing side deems irrelevant generally go to the weight of the expert's opinion, not its admissibility.").

As with Plaintiffs' other proposed experts, Defendant is free to cross-examine Bridges about his opinions and to present evidence to rebut those opinions. *Sheldon v. Munford, Inc.*, 950 F.2d 403, 410 (7th Cir. 1991) ("Once the district court has found a sufficient foundation for an expert's testimony, it properly leaves questions concerning his methodology, findings, and expertise to cross-examination."). Indeed, Defendants support many of their arguments against Bridges with the opinion of their own expert, Dr. Matthew J. Hickman. (*See* Dkt. 533-3.) Hickman was retained to, among other things, "review the expert report of Timothy Longo [and] the expert report of William Bridges." (*Id.* at 1.)[11]

In short, because Bridges's testimony is relevant and his methodology is reliable, the concerns expressed in Defendant's motion are better raised through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

2. Longo

Defendant also argues that Longo's opinions that are based on Bridges's analyses "lack reliability and foundation." (Dkt. 533 at 20−21.) Specifically, according

---

[11] Plaintiffs cite to a case in which another judge in this District barred Hickman from opining on similar subjects to those at issue in this case. (*See* Dkt. 516 at 21 (citing *Obrycka v. City of Chicago*, 2012 WL 3903673 (N.D. Ill. Sept. 7, 2012).) Although Plaintiffs explains that, as in *Obrycka*, "this Court should bar [Hickman] from [testifying] here" (*Id.*), that request is not properly before the Court in any of the pending motions and is thus not ripe for resolution in this Opinion.

to Defendant, Longo's conclusions about "sustain rates"—the "rates at which allegations of misconduct against police officers are upheld"—are "exclusively" derived from Bridges's statistical analysis. (*Id.* at 20.) Such reliance, Defendant claims, "dooms" Longo's opinions based on Bridges's findings. (*Id.*)

But Defendant misunderstands the role of Bridges's conclusions in Longo's analysis. Longo's references to the "sustain rates" developed by Bridges are found in the part of Longo's report titled "Systemically Low Sustain Rates and Statistical Analysis of *Monell* CR Files Further Evidence a Broken Accountability System." (Dkt. 533-2 at 75.) In Longo's report, Bridges's analyses are just some of the data points upon which Longo relies in concluding that Defendant "fail[s] to discipline officers found to have engaged in misconduct" and, more broadly, that Defendant's accountability system is "broken." (*Id.* at 73–75.) As explained above, there is nothing objectionable about an expert relying on the work of a colleague. *See Dura Auto. Sys. of Ind., Inc.*, 285 F.3d at 613; Fed. R. Evid. 703.

Contrary to Defendant's arguments, Longo's references to Bridges's analyses and even the replication of some of Bridges's tables in Longo's report do not render Longo a mere "mouthpiece" for Bridges. *Dura Auto. Sys. of Ind., Inc.*, 285 F.3d at 614. Defendant's motion to bar Bridges, and to bar Longo's opinions that are based on those of Bridges (Dkt. 533; No. 16-cv-01893, Dkt. 327), is denied.

### D. The Officer Defendants' *Daubert* Motion to Bar Opinions of Plaintiffs' False Confession Expert, Dr. Melissa Russano

Next, the Officer Defendants seek to exclude certain testimony from Plaintiffs' false confession expert, Dr. Melissa Russano. (Dkt. 496.) Russano is a Professor of

Criminal Justice at Roger Williams University. (Dkt. 515-1 at 1 (Under Seal).)[12] She has a Bachelor of Arts in psychology from the University of Virginia, as well as a master's degree and a Ph.D., both in psychology and with a legal psychology specialization, from Florida International University. (*Id.*) Russano's primary areas of research and expertise are "investigative interviewing, interrogations, and confessions, in the law enforcement, military, and human intelligence domains." (*Id.* at 2.) Russano seeks to opine in this case about several issues relevant to Plaintiffs' claims: the phenomenon of false confessions and false witness statements; the risk factors for making false confessions; the reliability of statements made in this case; the "interrogations and incriminating statements made by" Plaintiffs; and the "interrogations and resulting witness statements made by" several witnesses. (*Id.*)

In line with other courts in this District that have confronted similarly qualified experts, the Court finds Russano's false-confession testimony reliable. *See, e.g., Andersen v. City of Chicago*, 2020 WL 1848081, at *3 (N.D. Ill. Apr. 13, 2020); *Kluppelberg v. Burge*, 2016 WL 6821138, at *4 (N.D. Ill. Sept. 16, 2016); *Caine v. Burge*, 2013 WL 1966381, at *2 (N.D. Ill. May 10, 2013). Indeed, "the science of social psychology, and specifically the field involving the use of coercion in interrogations, is sufficiently developed in its methods to constitute a reliable body of specialized knowledge under Rule 702." *Kluppelberg*, 2016 WL 6821138, at *4 (citing *United*

---

[12] Some of the parties' filings relevant to the Court's decision are under seal. But the information disclosed in this Opinion cannot be justifiably sealed under the requirements of well established law in this Circuit. *Baxter Int'l v. Abbott Lab's*, 297 F.3d 544, 546–47 (7th Cir. 2002); *Union Oil v. Leavell*, 220 F.3d 562, 567–68 (7th Cir. 2000). Under-seal documents are indicated as being "Under Seal" only in the first citations to those documents.

*States v. Hall*, 974 F. Supp. 1198, 1205 (C.D. Ill. 1997)); *see also Harris v. City of Chicago*, 2017 WL 2436316, at \*7 (N.D. Ill. June 5, 2017) ("[N]umerous federal courts [have] conclud[ed] that the science of psychology in relation to police coercion in interrogations is sufficiently developed to constitute a reliable body of specialized knowledge[.]").

Defendants do not dispute the reliability of Russano's general false-confession testimony. Rather, in their motion, Defendants seek to bar Russano from testifying about anything that "go[es] beyond her expertise, such as criticisms of the Marshall Morgan Jr. homicide investigation, inferences to be drawn from the presence or absence of forensic evidence and Russano's 'reliability analysis,' which is her attempt to determine the truth of what happened." (Dkt. 496 at 1.) Defendants also seek to bar Russano from testifying "that Washington's confession or other witness statements were indeed false and coerced." (*Id.*)

Defendants' argument that Russano should not be allowed to offer "opinions for which she has no basis or expertise to offer" (Dkt. 496 at 15) is, to an extent, a tautology; experts cannot testify about the matters on which they are not experts. *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." (citation omitted).). But Defendants also direct the Court to a laundry list of Russano's statements and opinions that they find objectionable based on Russano's purported lack of qualifications. (Dkt. 496 at 6–10.)

Such objectionable opinions "include[e] but [are] not limited to the following: her 'reliability analysis' and any testimony regarding an analysis of the facts; her conclusions that Washington's confession or any statement is false and/or coerced; and any testimony related to forensic sciences for which she has no expertise; any testimony as to what witnesses were thinking; [and] any testimony critical of any aspect of the homicide investigation." (Dkt. 496 at 15.)

The line between matters appropriately excluded and those that should be subject to vigorous cross-examination is a difficult one to draw with precision. After closely reviewing each of Russano's statements identified in Defendants' motion, the Court is satisfied that, with one exception (*see below*), Defendants' concerns are more appropriately addressed through cross-examination and the adversarial process. *See Caine*, 2013 WL 1966381, at *2 ("[M]any of Defendants' objections to [Plaintiff's false confession expert's] testimony can be explored and challenged during cross-examination.").

The majority of the ostensibly objectionable statements in Russano's report are properly construed as the factual underpinnings of her opinions; those statements are not the core conclusions she reaches.[13] Such "factual underpinnings," if inaccurate, are properly "subject to counter-attack." *Walker*, 208 F.3d at 586; *see Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000) ("[T]he accuracy

---

[13] Plaintiffs concede that they only retained Russano to offer three opinions: about (1) the phenomenon of false confessions and false witness statements, (2) the known risk factors for making false confessions, which Russano applies in analyzing the statements offered by various parties during the investigation, including Plaintiffs, and (3) the reliability of statements in this case. (Dkt. 515 at 2.)

and truthfulness of the underlying medical history is subject to meaningful exploration on cross-examination and ultimately to jury evaluation."). Defendants can present evidence that Russano made incorrect assumptions or relied on incorrect facts. Based on such evidence, "a jury reasonably might [choose] not to credit [Russano's] testimony." *Walker*, 208 F.3d at 586.

Consider, for instance, the section of Russano's report on "Investigative Bias or 'Tunnel Vision.'" (Dkt. 515-1 at 31−38.) In that section, Russano discusses one of the "risk factors for false confessions/statements"—generically referred to as "confirmation bias"—which occurs "when a person forms an initial opinion, and subsequently processes new information in a way that confirms his or her initial opinion." (Dkt. 515-1 at 31.) She lists a variety of examples from this case that suggest to her "that investigator tunnel vision played a role in the investigation of Mr. Hood and Mr. Washington as suspects, and [others] as witnesses in this case." (*Id.* at 32.) Properly construed in context of her report, those examples are the type of assumptions and purported facts that Defendants are free to challenge through cross-examination.

Defendants' related concern that "Russano ignored key facts that undermine her conclusion" (Dkt. 496 at 10) is likewise more properly addressed through cross-examination or presentation of contrary evidence. Experts "routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence." *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006). Experts such as Russano are entitled to substantial "latitude" in their selection of variables

and data. *Manpower, Inc.*, 732 F.3d at 808−09. Disputes over Russano's selection of which facts to consider "goes to the probative weight of the analysis rather than to its admissibility." *Id.*; *see id.* at 809 (Whether an expert "selected the best data set to use . . . is a question for the jury, not the judge.").

Defendants also argue that Russano "should not be permitted to offer opinions other than whether factors of false [confessions] were present." (Dkt. 496 at 10.) According to Defendants, she "should not be permitted to delve into analyzing the underlying facts and evidence and criticizing each step of the investigation to assert that a false confession or statement likely happened here." (*Id.*) As support, Defendants cite to *Chatman v. City of Chicago*, No. 14-cv-2945 (N.D. Ill.), in which another judge in this District limited Russano's testimony. (*See* Dkt. 496 at 11−12.) But it is unclear why Russano should be so limited in this case. Russano is qualified to testify about false confessions, including by applying "the science of false confessions to the facts of [Plaintiffs'] case, first laying out risk factors and then pointing to such risk factors present in the facts here." *Andersen v. City of Chicago*, 2020 WL 1848081, at *3 (N.D. Ill. Apr. 13, 2020) (citing *Manpower, Inc.*, 732 F.3d at 806).

*Chatman* supports the admissibility of Russano's testimony. In that case, the court, addressing arguments similar to those presented by Defendants, barred Russano from "offer[ing] an opinion as to [the plaintiff's] actual innocence, whether he in fact provided a false confession, or the credibility of any witness at trial." (Dkt.

496-1 at 9.) But Russano's report contains no such conclusions[14] and, in fact, the *Chatman* court expressly permitted Russano to testify about "the factors that are indicative of a false confession" and whether those factors were "present in [that] case." (*Id.*) The opinions Plaintiffs seek to solicit from Russano in this case (*see above*) are consistent with those the *Chatman* court previously deemed admissible.

Finally, Defendants argue that Russano's "Reliability Analysis" is itself unreliable and that testimony about such analysis "is not allowed." (Dkt. 496 at 14.) Russano analyzes the "reliability" of statements made during Defendants' investigation—not only purported admissions, but also statements made in conjunction with those admissions, which together form "post-admission narrative[s]."[15] (Dkt. 515-1 at 51.) According to Russano, "research indicates that people cannot reliably distinguish between true and false confessions/statements," and "the reason why it is so difficult to recognize a false confession when we see one is because false confessions typically look and feel like true confessions." (*Id.*) She describes several "facets" of post-admission narrative statements indicative of those statements' reliability, including the "accuracy and completeness of the narrative[s]," the "presence of non-public [corroborating] details," and any "independent corroboration." (*Id.* at 52–55.) According to Russano, "[t]he more consistent the post-

---

[14] To the extent that Russano seeks to testify about the contested subjects (e.g., Plaintiff's actual innocence, whether Plaintiff provided a false confession, or witness credibility), Defendants can object to questions that would prompt inadmissible opinion testimony.

[15] Russano defines a "post-admission narrative" as "the details provided by the subject beyond an admission that the person was involved or possessed relevant guilty knowledge about someone else." (Dkt. 515-1 at 51.)

admission narrative, the more non-public details provided (that could not or were not the product of contamination), and the more independent corroborating evidence the statement led to, the greater the likelihood that the statement is reliable." (*Id.* at 51.) After describing the facets of reliability analysis, Russano analyzes the reliability of statements in the case, including those of Plaintiff Washington. (*Id.* at 55−69.)

Although Russano is qualified to testify about reliability analysis—the "facets" of post-admission narratives indicative of reliability—and such testimony would assist the jury in understanding and evaluating statements made during Defendants' investigation, application of those facets to the present case requires Russano to consider matters outside her area of expertise. Those areas include the quality of corroborating evidence and police investigation practices. (*Id.* at 52−55.) Applying Russano's reliability analysis to Washington's statement, for example, requires her to evaluate the "[a]ccuracy and completeness of the narrative," which in turn requires her to probe the evidence that Defendants considered during their investigation. Russano is qualified to testify about false confessions, whether indicia that statements made in this case were false, and even what sorts of considerations render post-admission narratives reliable (*see above*), but she is not qualified to assess other areas of the criminal investigation such as the quality of the Officer Defendants' evidence. *See Andersen*, 2020 WL 1848081, at *2. As another court confronted with similar testimony explained,

> [A proposed false confessions expert] cannot testify about the specifics of the post-admission narrative statement in this case. Such an endeavor would require [the expert] to assess the inconsistencies between [the plaintiff's] statements to the police and the evidence

presented at trial. [The expert] has no more expertise to perform this task than any juror. It is beyond [the expert's] knowledge as a social psychologist to assess the weight of the evidence and the credibility of witnesses. Of course, [the expert] can speak of the post-admission narrative statement as a technique by which social psychologists screen out true from false confessions in order to form systematic observations about them. He may even hypothesize to the jury that the post-admission narrative statement is a valid method by which to test the truth or falsity of a confession. However, he cannot go so far as to analyze [the plaintiff's] post-admission narrative statement in this manner. That task is for the jury alone."

*Hall*, 974 F. Supp. at 1205; *cf. Harris* 2017 WL 2436316, at *15 ("Although [a false confessions expert] experience includes observing confessions and interrogations, he does not have sufficient law enforcement or forensic evidence experience or training to connect the dots to" another subject.).

Accordingly, and in sum, the Officer Defendants' motion (Dkt. 496; No. 16-cv-01893, Dkt. 307) is granted in part and denied in part. Russano is barred from testifying about the application of her reliability analysis to statements in the present case. Defendants' motion is denied in all other respects.

### E. The Officer Defendants' Motion to Bar Opinions of Plaintiffs' Rebuttal Expert, Dr. Jonathan Arden

Plaintiffs also offer Dr. Jonathan Arden as an expert—according to them, to rebut the testimony of two of Defendants' witnesses: Dr. Mitra Kalelkar (the forensic pathologist who conducted the autopsy on Marshall Morgan, Jr.) and Victoria Hurtado (a police practices expert). (*See* Dkt. 508-6.)[16] Plaintiffs concede that they

---

[16] Defendants disclosed Kalelkar and Hurtado in their Rule 26(a)(2) disclosures. (*See* Dkt. 508-2 at 2 ("Hurtado may be called as a retained expert witness to present evidence at trial under Federal Rules of Evidence 702, 703 or 705"); *id.* at 5 (Kalelkar "may be called to present certain evidence at trial under Federal Rules of Evidence 702, 703, or 705").)

will only be able to call Arden to testify if Defendants present the expert opinions of Kalelkar or Hurtado. (Dkt. 508 at 11 n.4.)

Rule 26 of the Federal Rules of Civil Procedure permits parties to "to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)." Fed. R. Civ. P. 26(a)(2)(D)(ii). In turn, the Seventh Circuit has confirmed that "rebuttal evidence" is that which "contradict[s], impeach[es] or defuse[s] the impact of evidence offered by an adverse party." *Peals v. Terre Haute Police Dep't,* 535 F.3d 621, 630 (7th Cir. 2008). The analysis in Arden's expert report is properly so limited to that which would rebut Kalelkar's or Hurtado's testimony if either were called to testify. (*See* Dkt. 508-6 at 3−5.) Arden's report is divided into two parts—one on "Dr. Kalelkar," the other on "Ms. Hurtado"—in which he describes and responds to the opinions and potential testimony that would be offered by those two witnesses. (*Id.*)[17] Arden's opinion and potential testimony are thus properly construed as rebuttal testimony under Rule 26.

The Officer Defendants nonetheless seek to bar Arden's testimony on procedural grounds. (Dkt. 495 at 2.) According to them, Kalelkar's opinions and autopsy report "are part of the underlying facts and are therefore evidence in the case available to both sides during fact discovery." (*Id.*) They contend that Kalelkar is not

---

[17] Arden's opinion is based on his review of, among other things, Kalelkar's autopsy report, Kalelkar's deposition and accompanying exhibits, and Hurtado's report. (*See* Dkt. 508-6 at 2.) Arden's disputes with Hurtado's report are primarily directed at Hurtado's reliance on Kalelkar's opinions. (*See id.* at 5.)

an "expert" for rebuttal purposes, and thus that Arden "should have been disclosed as an expert for Plaintiffs' cases in chief." (*Id.*)

Much of the parties' disagreement turns on whether Kalelkar's opinions (to which Arden purports to respond) were part of the underlying facts in this case that were available to Plaintiffs before Defendants made their Rule 26(a)(2) disclosures. According to Defendants, "Plaintiffs knew about Dr. Kalelkar and how her opinions would be used long before [Kalelkar] was disclosed as a non-retained expert." (Dkt. 559 at 3.) But the Rules do not premise the disclosure of rebuttal experts on the knowledge of the opposing parties. (*See above.*) In fact, so premising Plaintiffs' disclosure obligation on Plaintiffs' knowledge would not make sense because factual evidence (such as a fact witness) is meaningfully different from expert evidence. *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004) (citing *Daubert*, 509 U.S. at 113). Expert disclosures are treated differently "because there are countermeasures that could [be] taken that are not applicable to fact witnesses." *Id.* at 757–58.

Contrary to Defendants' suggestion (Dkt. 559 at 1–2), the mere fact that Arden's opinion might support Plaintiffs' case in chief does not render Arden's testimony inadmissible. It is true that a party may not offer testimony "under the guise of 'rebuttal' only to provide additional support for his case in chief." *Cage v. City of Chicago*, 2012 WL 5557410, at *2 (N.D. Ill. Nov. 14, 2012) (citing *Peals*, 535 F.3d at 630). Testimony "offered *only* as additional support to an argument made in a case in chief . . . is improper on rebuttal." *Peals*, 535 F.3d at 630 (emphasis added). But, as

explained above, Arden's opinion is properly offered as rebuttal evidence. Accordingly, Plaintiffs are permitted to rely on that evidence as additional support. *See id.*; *cf. Ernst v. City of Chicago*, 2013 WL 4804837, at *2 (N.D. Ill. Sept. 9, 2013) ("Rebuttal reports can use, as well, additional data not found in the expert report, so long as it relates to the same subject matter.").

Defendants were not unfairly prejudiced by what they contend was Plaintiffs' tardy disclosure of Arden as a rebuttal expert. Defendants acknowledge that they had an opportunity to depose Arden. (Dkt. 495 at 7.) According to Plaintiff, that deposition lasted "over six hours." (Dkt. 508 at 11.) Moreover, although Defendants contend that "Plaintiffs have unfairly blocked Defendants from presenting their own expert to challenge Dr. Arden's opinions," in that Arden is chiefly responding to Kalelkar and Hurtado, Defendants are already presenting "their own expert[s]" on the subjects about which Arden would testify. (Plaintiffs, as noted, concede they will not be able to call Arden to testify unless Defendants first present the expert opinions of Kalelkar or Hurtado. *See* Dkt. 508 at 11 n.4.) Defendants' motion to bar Arden from testifying as a rebuttal witness (Dkt. 495; No. 16-cv-01893, Dkt. 306) is accordingly denied.

## III. DEFENDANTS' SUMMARY JUDGMENT MOTIONS

### A. Standard of Review

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th

Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322−23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted). All facts, and any inferences to be drawn from them, are viewed in the light most favorable to Plaintiff as the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

### B. Defendant City of Chicago's Motion for Summary Judgment

Plaintiffs bring claims against Defendant City of Chicago, alleging that the Officer Defendants actions were undertaken "pursuant to policies and practices" including Defendant City's "failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations." (Dkt. 1 ¶¶ 111−15; No. 16-cv-01893, Dkt. 1 ¶¶ 117−21.) More specifically, Plaintiffs allege the City had policies and practices of (1) coercing suspect and witness statements; (2) failing to investigate and discipline officers accused of misconduct; (3) failing to adequately

supervise and train its officers; (4) fostering a "code of silence";[18] and (5) withholding exculpatory and impeachment information from prosecutors and criminal defendants.[19] (*See generally* Dkt. 1.) Those customs and practices, according to Plaintiffs, led to the deprivation of Plaintiffs' rights to fair trials and to their liberty. Defendant seeks summary judgment on each theory of *Monell* liability. (Dkt. 482; *see* Dkt. 530.)

Under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), Plaintiffs may premise Defendant's liability on (1) an express policy that, when enforced, causes a constitutional violation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policymaking authority. *See McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000); *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008).

To survive summary judgment, Plaintiffs must be able to show (1) that Defendant had the above-listed widespread customs or practices; (2) that Defendant was deliberately indifferent as to the known or obvious consequences of the customs or practices; and (3) that Defendant's customs or practices were the "moving force"

---

[18] Longo defines a "code of silence" as "affirmative acts or omissions by an agency or its[] membership which insulate and protect its employees from accountability and criticism." (Dkt. 533-2 at 116.)

[19] Plaintiff characterizes this as a "street files practice." According to Longo, "[s]treet files, also referred to as running files or working files, were separate investigative files that were kept by detectives during the course of investigating a crime." (*Id.* at 107.)

behind the constitutional violation. *See First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986−87 (7th Cir. 2021).

### 1. Widespread Customs or Practices

The Seventh Circuit has not "adopt[ed] any bright line rules defining a 'widespread custom or practice.'" *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). There is "no clear consensus as to how frequently such conduct must occur to impose *Monell* liability except that it must be more than one instance, or even three." *Id.* (cleaned up). A plaintiff must, however, show that there is a policy at issue, not just a random event. *Id.* Such a policy "may take the form of an implicit policy or gap in expressed policies." *Id.* (citation omitted).

Plaintiffs can establish a municipality's *Monell* liability "directly" by showing that a "policy itself is unconstitutional" or "indirectly 'by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers.'" *Est. of Novack ex rel. Turbin v. Cnty. Of Wood*, 226 F.3d 525, 530 (7th Cir. 2000) (quoting *Jackson v. Marion Cnty.*, 66 F.3d 151, 152 (7th Cir. 1995)).

Plaintiffs present sufficient evidence to support their *Monell* claims against Defendant. Briefly, that evidence includes but is not limited to the following:

- Longo's opinion that Defendant has a widespread practice of coercing confessions. (Dkt. 556 ¶ 33.)

40

- Longo's opinion that Defendant did not take seriously its oversight, supervision, and discipline of officers. (*Id.* ¶ 48.)

- The fact that Defendant did not investigate certain complaints against officers between 1989 and 1996. (*Id.* ¶ 76.)

- Longo's opinion about the "systemic bias in favor of the officer in the context of administrative investigations." (*Id.* ¶ 79.)

- Longo's opinion about the adequacy of Defendant's EIS program. (*Id.* ¶ 110.)

- Longo's opinions about the "code of silence" in Defendant's Police Department. (*Id.* ¶¶ 115–17.)

- Longo's opinions about the adequacy of policies enacted in the wake of other litigation to address concerns that officers were withholding exculpatory and impeachment information from prosecutors and criminal defendants. (*Id.* ¶ 141.)

To be clear, these are only some examples of the evidence with which Plaintiffs may support their claims against Defendant. Plaintiffs also point to the absence of evidence that Defendant took actions to ameliorate the above customs and practices (the relevance, admissibility, and weight of which Defendant disputes). (*See, e.g.*, *id.* ¶¶ 60, 76, 78, 84, 102, 141.) Viewing the above examples, as well as other admissible evidence, in their favor, *see Scott*, 550 U.S. at 378, Plaintiffs present sufficient evidence to survive summary judgment as to their *Monell* claims against Defendant City of Chicago.

2.     Deliberate Indifference

In addition to proving the existence of widespread customs or practices, Plaintiffs must prove that Defendant's "municipal action was taken with the requisite degree of culpability." *Bd. Of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). Specifically, Plaintiffs must show that Defendant was "deliberate[ly]

indifferen[t] as to [the customs' or practices'] known or obvious consequences." *Montano v. City of Chicago,* 535 F.3d 558, 570 (7th Cir. 2008) (citing *Brown,* 520 U.S. at 407).

"Deliberate indifference" is a "stringent standard of fault." *Id.* (quotation omitted). Plaintiffs "must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *First Midwest Bank Guardian of Est. of LaPorta*, 988 F.3d at 987. Based on Longo's report, proffered proof of Defendant's inaction, and other evidence in the record (*see above*), a reasonable jury could conclude that Defendant was deliberately indifferent to the customs and practices that led to Plaintiffs' constitutional injuries.

Defendant argues that its firing of Jon Burge[20] "two months prior to the events giving rise to this lawsuit" demonstrates that "it was not deliberately indifferent to the alleged practice of fabricating and coercing statements." (Dkt. 482 at 6.) According to Defendant, firing Burge was an "affirmative step[] to eliminate the practice of fabricating and coercing suspect and witness statements." (*Id.* at 8.) But Burge's conduct was not, standing alone, one of the "widespread custom[s] or practice[s]" at issue in this case. Whether firing Burge mitigated any or all of Defendant's deliberate indifference is a question of material fact not properly resolved at this time. Viewing

---

[20] Burge was a CPD commander in the 1980s and early 1990s. Burge was accused of torturing and physically abusing suspects to obtain confessions, and his conduct received widespread public attention in the years and decades after it was exposed. *See United States v. Burge*, 2009 WL 2386147, at *1 (N.D. Ill. July 29, 2009) (documenting some of the reporting on Burge).

the facts in the light most favorable to Plaintiffs, the Court cannot conclude that Burge's firing warrants summary judgment in Defendant's favor.

### 3. Causation

Finally, Defendant's policy or practice "must be the direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs. Of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (cleaned up); *see Est. of Novack ex rel. Turbin*, 226 F.3d at 530. Although "but-for causation . . . does not suffice under *Monell*," *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir. 2019) (citing *Wilson v. Cook Cty.*, 742 F.3d 775, 784 (7th Cir. 2014)), "[a]s long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury," *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017) (quoting *Bielevicz v. Dubinon,* 915 F.2d 845, 851 (3d Cir. 1990)).

Plaintiffs present sufficient evidence from which a reasonable jury could find that Defendant's policies and practices were the "moving force," *Woodward*, 368 F.3d at 927, behind the violations of Plaintiffs' constitutional rights to fair trials and to their liberty. Presented with the above evidence as well as that evidence discussed below in the context of the Officer Defendants' motion for summary judgment, a jury could conclude that Plaintiffs' constitutional injuries were the "plainly obvious consequence" of Defendant's customs and practices. *Bd. Of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 412.

\*        \*        \*

43

Accordingly, Defendant City's motion for summary judgment (Dkt. 482; No. 16-cv-01893, Dkt. 292) is denied.

## C.     The Officer Defendants' Motion for Summary Judgment

Against the Officer Defendants, Plaintiffs allege violations of due process, failure to intervene, conspiracy to deprive them of their civil rights, malicious prosecution under state law, intentional infliction of emotional distress, and state-law civil conspiracy. (Dkt. 1 ¶¶ 84−95, 104−10, 116−31; No. 16-cv-01893, Dkt. 1 ¶¶ 84−110, 122−37.) Plaintiff Hood also brings a malicious prosecution claim under federal law (Dkt. 1 ¶¶ 96−103), and Plaintiff Washington alleges violations of his Fifth and Fourteenth Amendment rights (No. 16-cv-01893, Dkt. 1 ¶¶ 111−16). The Officer Defendants moved for summary judgment on all of Plaintiff Hood's claims as well as on all of Plaintiff Washington's claims except for his Fifth Amendment coerced confession claim and his state-law malicious prosecution claim. (Dkt. 493.)

Before proceeding to the Officer Defendants' arguments as to specific claims, there are two general arguments ripe for resolution. First, in their reply, the Officer Defendants argue that Plaintiffs' responses to the Officer Defendants' statements of material facts "should be stricken and those facts deemed admitted." (Dkt. 565 at 2.) According to Defendants, Plaintiffs "were required to serve and file 'a concise response' to each of Defendants' Rule 56.1 Statements of Material Facts" but instead "advance argument and inference, often couched as a lengthy 'clarification' and filled with additional facts that do not materially controvert or respond to the facts or the

44

supporting record citations, in violation of Local Rule 56.1(b)(3)." (*Id.*) Defendants catalog the responses they believe should be stricken. (*See id.* at 3–5.)

The Seventh Circuit has long recognized the discretion of district courts "to require strict compliance with [the district courts'] local rules governing summary judgment." *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000); *see Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994). Indeed, those rules "assist the [C]ourt by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence." *Markham v. White*, 172 F.3d 486, 490 (7th Cir. 1999).

But, as the Court's standing orders make clear, striking filings—and, in this instance, striking individual responses to the Officer Defendants' statements of material fact—is disfavored. *See also generally Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725, 727 (7th Cir. 2006). The Court is capable of discerning if a litigant has failed to comply with the requirements of Local Rule 56.1. In the assessment below of the Officer Defendants' motion for summary judgment, the Court limits its factual and legal analyses to those materials properly (not merely presently) before it. The Officer Defendants' request that some of Plaintiffs' responses to Defendants' statements of material facts be stricken is thus denied.

The second general argument—which manifests in multiple contexts in the Officer Defendants' motion—is that summary judgment should be granted to certain Defendants as to specific claims. Most significantly, they argue that summary

judgment is warranted for Defendants O'Brien and Carroll because "there is no evidence" that those officers "were personally involved in any alleged constitutional deprivation as to Hood." (Dkt. 499 at 53−54.)[21] But, as is described in greater detail below, there are sufficient facts in the record that, if accepted by, if accepted by a jury, could establish liability as to O'Brien and Carroll for the constitutional wrongs alleged against him. (*See, e.g.*, Dkt. 521 ¶¶ 38, 41−42, 123; Dkt. 588 ¶ 71.) There are critical disputes, for example, about what roles those officers played in West's interrogation and in the investigation that followed the interrogation. (Dkt. 588 ¶ 71.)

The Officer Defendants also argue that no evidence supports any of Plaintiff Washington's claims against Defendants O'Brien and Carroll, and that no evidence supports the claim that "Ryan and Lenihan were involved in eliciting Washington's confession." (Dkt. 499 at 54−55.) For the reasons given above, that argument fails against O'Brien and Carroll. As to Defendants Ryan and Lenihan, the record supports a finding that they were involved in the circumstances that yielded Washington's confession: after encountering Plaintiffs on the street, Ryan and Lenihan brought Washington to the police station on May 27, 1993 (Dkt. 558 ¶¶ 68−69) where he was detained for more than 36 hours days before confessing to his and Hood's involvement in Morgan Jr.'s murder (*id.* ¶ 100). Although the extent of their participation in Washington's interrogation is far from clear, Ryan's and Lenihan's roles in

---

[21] The Officer Defendants make the same argument as to Defendants Stout, Ball, Shinn, Clancy, and Posluszny. (Dkt. 499 at 53−55.) Because Plaintiffs concede that they are no longer proceeding against those officers, (Dkt. 531 at 75), the Court will consider the Officer Defendants' arguments only as to O'Brien and Carroll.

transporting Plaintiff Washington, and in the investigation generally, are enough to support Washington's coerced confession claim against those officers.

### 1. Plaintiffs' Due Process Claims

In Count I, Plaintiffs bring a due process claim under 42 U.S.C. § 1983 based on the purported fabrication of evidence by the Officer Defendants. (Dkt. 1 ¶¶ 84–91.) Plaintiffs allege that the Officer Defendants "fabricated false reports and other evidence, deliberately withheld exculpatory evidence, destroyed and/or intentionally lost material evidence, and used unduly suggestive identification procedures," and that, "[i]n doing so, the Defendants violated their clearly established duties to report all material exculpatory and impeachment information to prosecutors, to preserve material evidence and to ensure the integrity of eyewitness identifications." (*Id.* ¶ 86.) In essence, Plaintiffs argue that they were deprived of a fair trial because of those due process violations.

Plaintiffs' due process claim is comprised of allegations about several potential due process violations: (1) fabricating evidence; (2) withholding or destroying exculpatory evidence; and (3) employing unduly suggestive identification procedures. Although addressing each of the bases of Plaintiffs' due process claim is unnecessary, *see Goudy v. Cummings*, 922 F.3d 834, 838 (7th Cir. 2019) (looking at a plaintiff's Section 1983 "allegations as a whole," not the disaggregated bases of the plaintiff's Section 1983 claim), such an individualized assessment of those bases demonstrates why summary judgment cannot be granted.

### a. Fabrication of Evidence

The "essence of a due-process evidence-fabrication claim is that the accused was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial and thus depriving him of liberty without due process." *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020); *see Coleman v. City of Peoria*, 925 F.3d 336, 344 (7th Cir. 2019) (Using false evidence to convict "violates a defendant's right to a fair trial guaranteed by the Fourteenth Amendment's Due Process Clause." (citing *Mooney v. Holohan*, 294 U.S. 103 (1935))).

Succeeding on such a claim requires clearing a "high bar": Plaintiffs must establish not only that a statement was false but also that the Officer Defendants "manufactured" it. *Coleman*, 925 F.3d at 344 (citing *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). Plaintiffs must also show "that the evidence was used 'in some way' to deprive them of liberty." *Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) (quoting *Whitlock*, 682 F.3d at 580).

In their motion, the Officer Defendants first argue that "Plaintiffs have no cognizable due process claims based on the coercion of witnesses." (Dkt. 499 at 17.) Defendants' argument turns on the distinction between "coerced testimony" and "fabricated testimony." *See, e.g.*, *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) (distinguishing between coerced testimony, fabricated testimony, and false testimony, in that *coerced testimony* is "testimony that a witness is forced by improper means to give; the testimony may be true or false"; *fabricated testimony* is "testimony that is made up; it is invariably false"; and *false testimony* is "the equivalent [of

fabricated testimony]; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it.") (emphases added). According to Defendants, coerced evidence is not, "standing alone," a due process violation, and thus, "to the extent Plaintiffs' due process claims are based on the alleged coercion of West, Jody, Twinkie, Shaw, Brenda, Bob or, in Hood's case, Washington, the claims are not actionable." (*Id.* at 17−18 (quoting *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017)).)

But whether Defendants merely coerced, and did not fabricate, evidence against Plaintiffs is ultimately a question of fact not properly resolved on the present motion. Consider one example of the disputed facts that support Plaintiffs' fabrication claim. According to Plaintiffs, Washington "knew nothing about the crime" and "only provided his false statement [to the Officer Defendants] because the Defendants threatened him, physically abused him and promised Mr. Washington that if he cooperated with them and implicated Mr. Hood in Morgan Jr.'s murder, [Washington] could go home." (Dkt. 558 ¶ 100.)[22] The record is replete with material facts (the weight and accuracy of which the parties dispute) about the Officer Defendants' conduct that, according to Plaintiffs, amounted to fabrication of evidence. (*See, e.g., id.* ¶¶ 100−65.) Taking such facts in the light most favorable to Plaintiffs, there is

---

[22] Defendants argue that Plaintiffs' statement of additional fact in this paragraph is "improper and disputed." (Dkt. 558 ¶ 100.) Even disregarding the parts of Plaintiffs' statement that Defendants argue are improper, Plaintiffs' statement contains potentially admissible evidence that supports Plaintiffs' due process claim. Contrary to Defendants' suggestion, that evidence is not the type of "uncorroborated testimony" that the Seventh Circuit has held is insufficient to "defeat a motion for summary judgment." *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 939 (7th Cir. 1997).

sufficient evidence to support Plaintiffs' due process claim against the Officer Defendants.

The Officer Defendants also raise a series of arguments for why, according to them, Plaintiffs' fabricated-evidence due process claim fails. (*See generally* Dkt. 499 at 18−42.) For example, they argue that West's statement did not cause or contribute to a due process violation because West died before Hood's trial and West said nothing incriminating about Washington; that the statements and testimony of Rogers and Crossley cannot support a due process claim because the "causal chain was broken" when Rogers and Crossley gave contradictory statements (refuting their earlier statements to police) to Hood's lawyer, Mullenix; and that Bob's and Cage's statements cannot support such a claim because there is no evidence that those statements were fabricated. (*Id.*)

But the Officer Defendants' arguments target what are actually disputes of material fact. Plaintiffs offer evidence, for example, from which a jury could reasonably find that inculpatory statements made to the Officer Defendants by Plaintiffs Hood, Plaintiff Washington, West, Rogers, or Crossley were "fabricated."[23] (*See, e.g.*, Dkt. 558 ¶¶ 55, 74, 85, 100−05, 124−25, 148−49.) In turn, the import of those statements to Plaintiffs' prosecutions and whether they were material—in

---

[23] Contrary to the Officer Defendants' argument, when viewed alongside Plaintiffs' other evidence, Plaintiff Washington's testimony is not the type of "uncorroborated testimony" that is "insufficient to defeat summary judgment." *Weeks*, 126 F.3d at 939. If the Officer Defendants doubt Washington's testimony, they are free to challenge his credibility at trial. But such a challenge is not proper for consideration on the present motion. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." (citations omitted)).

other words, whether they were "reasonabl[y] likel[y]" to "affect[] the judgment of the jury" in Plaintiffs' trials, *Patrick*, 974 F.3d at 835—are questions of fact that cannot be resolved on the present motion.[24] Such critical disputes preclude entry of summary judgment in the Officer Defendants' favor as to the fabricated-evidence basis of Plaintiffs' due process claim.

### b.  *Withholding or Destroying Exculpatory Evidence*

Plaintiffs also allege that the Officer Defendants "deliberately withheld exculpatory evidence" and "destroyed and/or intentionally lost material evidence." (Dkt. 1 ¶ 86.) In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963); *see Kyles v. Whitley*, 514 U.S. 419, 439 (1995). The Supreme Court has expanded governments' *Brady* duties in several ways since that decision, including to "evidence known to police investigators even if unknown to the prosecutor." *United States v. Kimoto*, 588 F.3d 464, 474 (7th Cir. 2009).

---

[24] The Officer Defendants argue, and Plaintiffs concede, that Defendants are entitled to absolute immunity "for giving allegedly false testimony at trial proceedings." (Dkt. 499 at 40 (citing *Briscoe v. LaHue*, 460 U.S. 325 (1983)); *see* Dkt. 531 at 29.) But the Officer Defendants are not absolutely immune from fabricating inculpatory evidence in advance of Plaintiffs' trials. *See, e.g.*, *Avery v. City of Milwaukee*, 847 F.3d 433, 441 (7th Cir. 2017) (describing as "conflicting with [Seventh Circuit] caselaw" the notion that "an officer who fabricates evidence can immunize himself from liability by authenticating falsified documentary or physical evidence and then repeating the false 'facts' in his trial testimony"); *Walker v. White*, 2021 WL 1058096, at *8 (N.D. Ill. Mar. 19, 2021) ("[A]lthough an officer is immune from liability for his testimony alone, he is not immune from testimony that repeats or authenticates the content of the fabricated evidence." (citation omitted)).

To succeed on a due process claim under *Brady*, Plaintiffs must prove that "(1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, 'materiality.' " *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008). Evidence is considered suppressed "if (1) the prosecution failed to disclose evidence that it or law enforcement was aware of before it was too late for the defendant to make use of the evidence and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Anderson*, 932 F.3d at 504–05 (quotation omitted).

As they do against the fabrication-of-evidence basis of Plaintiffs' due process claim, the Officer Defendants raise a series of arguments for why summary judgment is warranted on the withholding-of-evidence basis of that claim. Defendants argue, among other things, that the evidence related to Morgan Sr. was not withheld, and that Plaintiffs are merely "recast[ing]" their fabrication claims as *Brady* claims. (Dkt. 499 at 42−49.)

But there are critical disputes of material fact about the extent of the Officer Defendants' knowledge and transmission of exculpatory evidence. For example, questions about what information Defendants Ryan and Lenihan had about possible links between Morgan Jr.'s murder and Soto's murder, and whether any documented suspicions about Morgan Sr. were communicated to Plaintiffs, remain in dispute. (*See, e.g.*, Dkt. 521 ¶ 139; Dkt. 558 ¶¶ 217−20, 237.) There is likewise circumstantial

evidence that some of the Officer Defendants kept street files with potentially material exculpatory information. (*See, e.g.*, Dkt. 558 ¶ 222.) Such evidence may support a finding that the Officer Defendants withheld exculpatory evidence in violation of their *Brady* obligations. *See, e.g.*, *Fields v. City of Chicago*, 981 F.3d 534, 563 (7th Cir. 2020). Given such disputes of material fact, summary judgment cannot be granted in the Officer Defendants' favor.

### c.    *Employing Unduly Suggestive Identification Procedures*

Finally, Plaintiffs allege that the Officer Defendants employed "unduly suggestive identification procedures" in violation of Defendants' duty "to ensure the integrity of eyewitness identifications." (Dkt. 1 ¶ 86.) A criminal defendant's right to a fair trial is violated "if unduly suggestive identification techniques are allowed to taint the trial." *Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006); *see Holloway v. City of Milwaukee*, 43 F.4th 760, 765 (7th Cir. 2022). Although "a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest," *Manson v. Brathwaite*, 432 U.S. 98, 113 n.13 (1977), the Seventh Circuit has recognized as a "prophylactic rule" that "unduly suggestive identification procedures" are actionable under Section 1983, *Alexander*, 433 F.3d at 555.

To succeed under this theory, Plaintiffs must establish that the flaws in the Officer Defendants' pretrial identification procedures "made [their] trial unfair." *McCullough v. Hanley*, 2018 WL 3496093, at *15 (N.D. Ill. July 20, 2018) (citation omitted); *see Cairel v. Alderden*, 2014 WL 916364, at *8 (N.D. Ill. Mar. 6, 2014).

Plaintiffs must do more than merely say "that a witness was shown a suggestive photo array or lineup and later testified." *Alexander*, 433 F.3d at 556. But the Officer Defendants may be liable if they "use[d] a specific interrogation technique clearly proscribed by existing law." *Coleman v. City of Peoria*, 925 F.3d 336, 347–48 (7th Cir. 2019). In assessing Plaintiffs' claim, the Court first considers "whether the identification procedure used by law enforcement was 'both suggestive and unnecessary,' " and, if it was, whether, "based on the totality of the circumstances, . . . the identification was sufficiently reliable to outweigh the effect of the tainted procedure." *Holloway*, 43 F.4th at 766 (quotation omitted).

The Officer Defendants argue that Plaintiffs fail to show that Defendants' "identification methods were so unduly suggestive as to deprive Plaintiffs of a fair trial" and that the officers involved in the collection of identification evidence, Defendants Ryan and Lenihan, are entitled to qualified immunity. (Dkt. 499 at 33.) But whether the circumstances under which the Officer Defendants procured identification evidence—such as Bob's identifications of Plaintiffs at night from a (disputed) distance away (Dkt. 558 ¶¶ 183−86)—were sufficiently coercive is a question of fact that cannot be resolved on the present motion. *Holloway*, 43 F.4th at 766.[25]

---

[25] Whether the Officer Defendants are entitled to qualified immunity is addressed separately below.

2. Plaintiffs' Failure-to-Intervene and Section 1983 Conspiracy Claims

Plaintiffs also allege that the Officer Defendants conspired to deprive Plaintiff of his rights to due process and to a fair trial, as well as that they failed to intervene to prevent the deprivation of those rights. (Dkt. 1 ¶¶ 92−95, 104−10.) As to the latter claim, although Plaintiffs "must establish [each Defendant's] personal responsibility for any claimed deprivation of a constitutional right," each Defendant's "direct participation in the deprivation is not required." *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000). An official satisfies the "personal responsibility requirement of § 1983" if he or she "acts *or fails to act* with a deliberate or reckless disregard of the plaintiff's constitutional rights." *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982). To succeed in their failure to intervene claim, Plaintiffs must prove that each Officer Defendant (1) "had reason to know . . . that any constitutional violation ha[d] been committed by a law enforcement official"; and (2) "had a realistic opportunity to intervene to prevent the harm from occurring." *Wilbon v. Plovanich*, 67 F. Supp. 3d 927, 946 (N.D. Ill. 2014); *see Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005); *Smith v. Augustine*, 2009 WL 481639, at *7 (N.D. Ill. Feb. 25, 2009).

To establish conspiracy liability in their Section 1983 claim, Plaintiffs "must show that (1) the individuals reached an agreement to deprive [Plaintiffs] of [their] constitutional rights, and (2) overt acts in furtherance actually deprived [Plaintiffs] of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (citation omitted). The overt acts need not themselves be illegal. *See Smith v. Burge*, 222 F. Supp. 3d 669, 697 (N.D. Ill. 2016).

The Officer Defendants argue that "there is no evidence to suggest that any other Officer Defendant caused or contributed to a constitutional deprivation and therefore, Plaintiffs' claims of conspiracy and failure to intervene against all other named Defendants fail." (Dkt. 499 at 49.) As to Plaintiffs' conspiracy claim, Defendants also argue that they are entitled to qualified immunity because, according to Defendants, "it cannot be said that the law [was] clearly established on this point . . . [t]hat is, reasonable officers would not necessarily know that a conspiracy amongst employees of a single municipality can violate the Constitution (no matter what the underlying substantive right is at stake)." (*Id.* at 50 (quoting *Haliw v. City of South Elgin*, 2020 WL 1304697, *4 (N.D. Ill. March 3, 2020)).)

But for the reasons discussed above, whether any (or all) of the Officer Defendants conspired to deprive Plaintiffs of their rights or failed to intervene to prevent the deprivation of those rights is not capable of resolution at this stage. Without repeating the above-described material facts that remain in dispute, because a reasonable jury could find that the Officer Defendants fabricated or withheld evidence and thus violated Plaintiffs' rights, summary judgment cannot be granted as to Plaintiffs' failure to intervene or conspiracy claims.[26]

### 3. Plaintiff Hood's Fourth Amendment Wrongful Detention and State Law Malicious Prosecution Claims

In Counts III and VI, Plaintiff Hood alleges that the Officer Defendants "unreasonably seized" him, and "improperly subjected [him] to judicial proceedings

---

[26] The Officer Defendants' qualified immunity as to Plaintiffs' Section 1983 conspiracy claim is addressed separately below.

for which there was no legitimate probable cause. (Dkt. 1 ¶¶ 96−103, 116−23.) To succeed in those related claims, Plaintiff Hood must show that the Officer Defendants "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Kuri v. City of Chicago*, 2017 WL 4882338, at *7 (N.D. Ill. Oct. 30, 2017); *Blocker v. City of Chicago*, 2017 WL 3278323, at *4 (N.D. Ill. Aug. 2, 2017) ("[P]rolonged pretrial detention without probable cause (including a judicial finding of probable cause based solely on false evidence supplied by police officers), violates the Fourth Amendment.").

Whether the Officer Defendants had probable cause to detain and prosecute Plaintiff Hood depends on whether "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). If "there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them," the determination of probable cause is "a proper issue for the jury." *Maxwell v. Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993); *see Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 623 (7th Cir. 2010); *Bonds v. Fizer*, 713 F. Supp. 2d 752, 761 (N.D. Ill. 2010).

There remain significant disputes of material fact the resolution of which are relevant to whether the Officer Defendants had probable cause to arrest and prosecute Plaintiff Hood. If a jury finds, for example, that the Officer Defendants

fabricated inculpatory evidence that Hood murdered Morgan Jr. (*see above*), the jury could also find that the Officer Defendants lacked non-fabricated probable cause for Hood's arrest. *See Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013) ("Knowingly false statements by [a witness that served as the basis for the criminal defendant's arrest and prosecution] cannot support a finding of probable cause."); *Kuri*, 2017 WL 4882338, at *7 ("Defendants cannot manufacture their own probable cause by fabricating evidence."). Whether (and, if so, when) the Officer Defendants had probable cause is undercut by the fact that the Officer Defendants released Hood even after identifying his fingerprints on beer bottles in the car in which Morgan Jr.'s body was found and after Hood failed a polygraph test. (*See* Dkt. 558 ¶ 61.) As one of the Officer Defendants conceded, they did not have probable cause to arrest Hood at that time. (*Id.*) Confronted with such disputes over the existence of probable cause, the Court cannot grant summary judgment as to Plaintiff Hood's wrongful detention and state law malicious prosecution claims at this stage.

### 4. Plaintiffs' IIED Claims

Plaintiffs also bring claims for intentional infliction of emotional distress. (Dkt. 1 ¶¶ 124−26.) To succeed in such claims, Plaintiffs must show that (1) the Officer Defendants' conduct was "truly extreme and outrageous"; (2) the Officer Defendants "intended the conduct [to] inflict severe emotional distress or kn[e]w that there [wa]s at least a high probability that [the] conduct w[ould] cause severe emotional distress"; and (3) the "conduct in fact caused severe emotional distress." *Totten v. Benedictine Univ.*, 2021 WL 3290926, at *11 (N.D. Ill. Aug. 2, 2021) (citing *Schweihs v. Chase*

*Home Fin., LLC*, 77 N.E.3d 50, 63 (Ill. 2016)).

The Officer Defendants argue that Plaintiffs' IIED claims are time-barred because "Plaintiff Hood was arrested on May 28, 1993, and Plaintiff Washington was arrested May 29, 1993, which means their IIED claims should have been filed no later than May 1994 to be timely." (Dkt. 499 at 55.) Indeed, under the Illinois Tort Immunity Act (TIA), the statute of limitations for claim against public officials is one year. 735 ILCS 10/8-101(a). Defendants cite *Friends-Smiley v. City of Chicago* for the proposition that "[t]he Seventh Circuit has broadly held 'that a claim of intentional infliction of emotional distress in the course of an arrest and prosecution accrues on the date of the arrest.'" (Dkt. 499 at 55 (quoting 2016 WL 6092637, at *2 (N.D. Ill. Oct. 19, 2016)).)

But under the bar set in *Heck v. Humphrey*, 512 U.S. 477 (1994), individuals convicted of state crimes cannot bring claims against state actors if such claims amount to "collateral attack[s] on the[ir] conviction[s]." *Parish v. City of Elkhart*, 614 F.3d 677, 680 (7th Cir. 2010). In cases similar to this one, other judges in this District have repeatedly held that IIED claims based on officers' "coercing [a plaintiff's] confession and prosecution, conviction, and imprisonment" are the type of claims that "directly attack[] the validity of [the plaintiff's conviction]." *Brown v. City of Chicago*, 2019 WL 4694685, at *7 (N.D. Ill. Sept. 26, 2019); *Smith*, 222 F. Supp. 3d at 693 ("Plaintiff bases his IIED claim on Defendants coercing his confession by torture, constructing and fabricating his confession, and procuring his prosecution, conviction, and imprisonment via his coerced and fabricated confession. Under these

facts, Plaintiff has directly attacked the validity of his conviction."); *Walker v. White*, 2017 WL 2653078, at *6 (N.D. Ill. June 20, 2017) ("[T]he IIED claim alleged in the complaint is tied to the validity of the conviction because it alleges that the extreme and outrageous conduct was related to the trial itself. [The plaintiff's] IIED claim based on his wrongful conviction is not time-barred."). *Friends-Smiley* is inapposite because the authority upon which the court in that case relied involved an IIED claim that did not threaten the validity of any state-court conviction and thus did not raise concerns under *Heck. See Friends-Smiley*, 2016 WL 6092637, at *2 (citing *Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013)).

Plaintiffs' IIED claims based on their wrongful convictions did not begin to accrue until their convictions were overturned. *See Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1043 (N.D. Ill. 2018). It is undisputed that the State vacated Plaintiffs' convictions and dismissed all charges against them on February 9, 2015. (Dkt. 558 ¶ 244.) Plaintiffs filed their suits on February 2 and 5, 2016, within the one-year statute of limitations. Plaintiffs' IIED claims are thus timely.

On the substance of Plaintiffs' IIED claims, summary judgment cannot be granted to the Officer Defendants on the present record. As other judges in this District have explained, "[a]n average member in the community would consider it outrageous for police officers to falsely frame, arrest and imprison an innocent citizen." *Henry v. Ramos*, 1997 WL 610781, at *2 (N.D. Ill. Sept. 28, 1997); *see Carroccia v. Anderson,* 249 F. Supp. 2d 1016, 1028 (N.D. Ill. 2003) ("If, as alleged, defendants fabricated false or misleading evidence of [the plaintiff's] guilt or

concealed exculpatory evidence from prosecutors, that behavior is sufficiently 'outrageous' to support a claim for intentional infliction of emotional distress."). If a jury is persuaded by Plaintiffs' evidence as to their other substantive claims (*see above*), the jury may similarly find the Officer Defendants liable for IIED.

### 5. Plaintiffs' State-Law Conspiracy Claims

Plaintiffs also bring conspiracy claims under state law, alleging that the Officer Defendants "conspired by concerted action to accomplish an unlawful purpose by unlawful means." (Dkt. 1 ¶ 128.) Under Illinois law, such a claim requires Plaintiffs to show "(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; [and] (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused the injury to the plaintiff." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) (citing *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999)). An express agreement among the alleged conspirators is not necessary. The participants "must simply share the same general conspiratorial objective." *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1057 (N.D. Ill. 2016) (citing *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013)). The existence of a conspiracy may be inferred through the combination of common sense and circumstantial evidence. *See Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015).

In their motion, the Officer Defendants argue that Plaintiffs "have not pointed to any specific tortious act by the alleged co-conspirators" and that Plaintiffs' "speculative hypothesizing without evidence is insufficient to create a triable

question of fact." (Dkt. 499 at 57 (citing *United States v. Sullivan*, 903 F.2d 1093, 1099 (7th Cir. 1990)).) But the disputed evidence in this case (*see above*) is enough to, at least circumstantially, support a finding that the Officer Defendants shared "the same general conspiratorial objective." *Patrick*, 213 F. Supp. 3d at 1057. Summary judgment thus cannot be entered in the Officer Defendants' favor as to Plaintiffs' conspiracy claims.

### 6. Qualified Immunity

As discussed above, the Officer Defendants argue that they are entitled to qualified immunity for some of the conduct alleged by Plaintiffs: specifically, (1) Defendants Ryan's and Lenihan's use of photos when they interviewed Cage and Bob (Dkt. 499 at 37−38); and (2) all the Officer Defendants' alleged conspiracy (*id.* at 50−51). Having raised the privilege of qualified immunity as a defense to that conduct, it becomes Plaintiffs' burden to defeat it. *See Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007).

Qualified immunity shields public officers such as the Officer Defendants from liability when the conduct of those officers "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (citing *Kisela v. Hughes*, 138 S. Ct. 1148 (2018)). Whether the Officer Defendants are entitled to qualified immunity turns on "first, whether the facts presented, taken in the light most favorable to the plaintiff[s], describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established at the time of the alleged

62

violation." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021) (citing *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014)). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotation omitted); *see Lovett v. Herbert*, 907 F.3d 986, 992 (7th Cir. 2018). "If *either* inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (cleaned up).

As to Defendants Ryan's and Lenihan's use of Plaintiffs' photos when they interviewed Cage and Bob, both officers are entitled to qualified immunity for that conduct. Even taking the facts in the light most favorable to Plaintiffs, the Court cannot find that such an identification practice was clearly prohibited at the time of that alleged violation.

The cases to which Plaintiffs cite (Dkt. 531 at 55) are inapposite and do not satisfy Plaintiffs' burden of showing that "every reasonable official would understand that" what Defendants Ryan and Lenihan did "violates [Plaintiffs'] right[s]." *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017) (quoting *Mullenix*, 136 S. Ct. at 308). Among others, Plaintiffs cite to *Stovall v. Denno*, in which the Supreme Court characterized "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup" as "widely condemned," 388 U.S. 293, 302 (1967), and *Manson v. Brathwaite*, in which the Court explained that "identifications arising from single-photograph displays may be viewed in general with suspicion," 432 U.S. 98, 116 (1977). Neither of cases established—let alone "clearly

established"—that Defendants Ryan's and Lenihan's display of Plaintiffs' photographs to Cage and Bob was a violation of Plaintiffs' rights.[27]

Whether the Officer Defendants are entitled to qualified immunity from Plaintiffs' Section 1983 conspiracy claim is more complicated. According to Defendants, it was not "clearly established" that "a conspiracy amongst employees of a single municipality can violate the Constitution." (Dkt. 499 at 50 (quoting *Haliw*, 2020 WL 1304697, at \*4).) But what matters is not whether Defendants' conspiracy violated Plaintiffs' rights; rather, what matters is whether the conduct underlying that conspiracy violated those rights. *See Fields*, 740 F.3d at 1114. Put another way, "what must be clearly established is limited to the *underlying constitutional right* that the Defendants conspired to violate." *Liggins v. City of Chicago*, 2021 WL 2894167, at \*6 (N.D. Ill. July 9, 2021); *see Ochoa v. Lopez*, 2021 WL 4439426, at \*9 (N.D. Ill. Sept. 28, 2021); *Harris*, 2020 WL 7059445, at \*5.[28]

---

[27] In their response, Plaintiffs seek to recharacterize Defendants Ryan's and Lenihan's conduct as "conduct[ing] a single photo show-up to induce [a false] identification." (Dkt. 531 at 55.) But even accepting that recharacterization, the cases to which Plaintiffs cite do not draw any distinctions based on the intentions of the officers seeking identification evidence. In other words, even assuming Ryan and Lenihan intended to induce Cage or Bob to produce false identifications when they showed Plaintiffs' photographs to those witnesses (*see, e.g.*, Dkt. 588 ¶ 174), Plaintiffs have not satisfied their burden of showing that such an intentional showing was a clearly established violation of Plaintiffs' rights in 1993.

[28] There is an intra-District split in decisions on the application of qualified immunity to the intracorporate conspiracy doctrine. *Compare, e.g.*, *Haliw*, 2020 WL 1304697, at \*4 *with Walker*, 559 F. Supp. 3d at 752–53. Without wading into those debates, the Court is persuaded that there are at least disputes of material fact as to whether the Officer Defendants' conduct is the type of "routine decision-making by government officials" to which the doctrine applies, *Ochoa v. Lopez*, 2021 WL 4439426, at \*9, such that summary judgment cannot be granted on those grounds.

Properly considering the conduct underlying Plaintiffs' conspiracy claim—fabricating evidence and withholding exculpatory evidence (*see* Dkt. 1 ¶¶ 104−110)—the Officer Defendants are not entitled to qualified immunity as to that claim.[29] It has long been clearly established (well before the facts giving rise to this case) that officers must not "withhold exculpatory information." *Goudy*, 922 F.3d at 844; *Whitlock v*, 682 F.3d at 585 ("[A]ll courts that have directly confronted the question before us agree that the deliberate manufacture of false evidence contravenes the Due Process Clause."). The above-described disputes of material fact about whether the Officer Defendants fabricated or withheld evidence thus preclude a finding that they are entitled to qualified immunity. *Mayoral*, 245 F.3d at 938 ("Summary judgment may be granted only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law."); *see Weinmann v. McClone*, 787 F.3d 444, 451 (7th Cir. 2015) (affirming denial of summary judgment because the "existence of a factual dispute about the circumstances [giving rise to the allegedly unlawful conduct] preclude[d] a ruling on qualified immunity"); *Strand v. Minchuk*, 910 F.3d 909, 918 (7th Cir. 2018) (similar); *Holmes v. Hernandez*, 2021 WL 4244756, at *8 (N.D. Ill. Sept. 17, 2021) ("[D]isputes of material fact may preclude qualified immunity, when reading the facts in the light most favorable to the plaintiff leads to the conclusion that a reasonable jury could find that the defendant violated a clearly established right.").

---

[29] Notably, the Officer Defendants do not seek qualified immunity as to Plaintiffs' "underlying" claims.

In sum, Defendants Ryan and Lenihan are entitled to qualified immunity as to Plaintiffs' claim that those Defendants violated Plaintiffs' rights by showing Plaintiffs' photographs to Cage and Bob. The Officer Defendants are not entitled to qualified immunity as to Plaintiffs' Section 1983 conspiracy claim.

*   *   *

Accordingly, the Officer Defendants' motion for summary judgment (Dkt. 493; No. 16-cv-01893, Dkt. 304) is granted in part and denied in part. Summary judgment is granted in favor of Defendants Ryan and Lenihan as to Plaintiffs' claim that those officers violated Plaintiffs' due process rights by showing photographs to Cage and Bob. Summary judgment is denied in all other respects.

## IV.    CONCLUSION

For the foregoing reasons, the Officer Defendants' *Daubert* motion as to Russano (Dkt. 496; No. 16-cv-01893, Dkt. 307), and their motion for summary judgment (Dkt. 493; No. 16-cv-01893, Dkt. 304), are granted in part and denied in part. All other motions addressed in this Opinion (Dkt. 485, Dkt. 533, Dkt. 495, Dkt. 482; No. 16-cv-01893, Dkt. 295, Dkt. 327, Dkt. 306, Dkt. 292) are denied.

SO ORDERED in 16-cv-01893 and 16-cv-01970.

Date: September 30, 2022

_____
JOHN F. KNESS
United States District Judge